1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

9
10

PCF INSURANCE SERVICES OF THE
WEST, LLC,

Plaintiff,

11

v.

12
13

JAMES FRITTS AND RI INSURANCE
SERVICES, LLC,

14

Defendants.

Case No.

COMPLAINT

15
16

**COMPLAINT**

17

Plaintiff PCF Insurance Services of the West, LLC ("PCF"), by and through its

18

undersigned counsel, hereby alleges, upon personal knowledge and belief, against Defendants

19

James Fritts and RI Insurance Services, LLC, as follows:

20

**SUMMARY OF THE ACTION**

21
22

1.       PCF brings this action to recover damages inflicted on it by the former leader of

one of its partner agencies who has engaged in a covert scheme to defraud PCF of millions of

23

dollars.  PCF recently discovered that Defendant James Fritts, who sold the Rice Insurance

24

Agency ("Rice") to PCF in 2021, has been manipulating the financial records of Rice to

25

deliberately inflate his earn-out payments from the sale.  Through an investigation into

26

accounting irregularities, PCF discovered a deliberate plot to fleece PCF for as much as Fritts

27
28

COMPLAINT

could steal.  PCF seeks to recover the substantial damages it has incurred as a result of this massive fraud.  Although PCF is still unraveling the full extent of Fritts's fraud, PCF currently estimates that it has suffered tens of millions of dollars in damages.

2.      Fritts's scheme centered on earn-out opportunities that PCF offered to Fritts and his partners when it purchased their insurance agency and retained them to continue running it. The earn-outs were based on agreed-upon growth targets.  For the first five years following the sale, Fritts could earn a bonus if Rice's earnings increased a designated percentage over previous years.  The percentages and multiples could change from year to year depending on Rice's performance, but the first year provided the most lucrative opportunity.  Assuming Rice's earnings were at least 3% over its Closing EBITDA,[1] for every $100 Rice earned above that amount, Fritts would get $1,000 in earn-out.  PCF offered the earn-outs to incentivize Fritts and his partners to grow their business, which would benefit the PCF organization as a whole.  Rather than work to earn the earn-outs honestly, Fritts manipulated Rice's financial records to make it appear as though Rice had greatly exceeded its growth targets when, in reality, that was not true.  Fritts developed his fraudulent plan before he even signed the purchase agreement and, therefore, induced PCF to enter that agreement with the intent to defraud PCF.

3.      Fritts enlisted the help of Rice's Controller, Rick Heerspink, to carry out his scheme.  While he was still negotiating the terms of the purchase agreement, Fritts informed Heerspink that they should hold off booking commission checks because he "would rather have it hit the earn out … why take a dollar today when it is worth 10x in the earn out … attorneys just elaborated."

---

[1]  Any undefined capitalized terms have the same meaning set forth in the July 15, 2021 Asset Purchase Agreement (the "APA"), which is attached as Exhibit A to this Complaint.

COMPLAINT
- 2 -

4.      Together, Fritts, Heerspink and others executed the plan to inflate Rice's earnings and constructed barriers to prevent PCF from discovering the truth.  They maintained a second, secret set of books at Rice, where they parked certain bona fide Rice business expenses in order to inflate Rice's earnings.  Many of these expenses were funded through a bank account that Rice owned prior to signing but did not disclose in the purchase agreement.  Fritts and Heerspink also maintained Rice's pre-signing payroll system even though they were supposed to transition all employees to PCF's system.  They used this "side" payroll system to compensate employees in order to keep that compensation off of Rice's books.

5.      PCF has learned that Fritts closely monitored Rice's earnings and, when the end of an earn-out period was approaching, he and Heerspink would instruct employees to time the recognition of expenses and revenues to maximize the earn-out.  Fritts and Heerspink closely controlled the flow of information to PCF, allowing only certain employees to engage with PCF management.  They also reprimanded at least one employee multiple times for reporting information to PCF that might have revealed Fritts's scheme.

6.      The truth has only recently emerged.  In July 2023, PCF learned of accounting discrepancies at Rice, which triggered a preliminary audit that uncovered several categories of expenses that did not appear anywhere in Rice's financial records.  Aware that PCF was about to blow the lid on his plot, Fritts frantically sought to obstruct PCF's investigation by denying PCF access to payroll information and instructing employees to avoid speaking to the auditors.  Determined to get to the bottom of the matter, PCF placed Fritts on administrative leave and began a full investigation.  The revelations of that investigation are shocking.

7.      PCF has uncovered a slew of emails where Fritts admits that he intended to manipulate Rice's earnings in order to drive up the earn-outs.  In one such email, Fritts explains that the reason the second-year earn-out was not expected to be large was because he

COMPLAINT

- 3 -

had "pushed a lot of expenses into this year which benefited last years [sic] earnout as well as pushed a lot of July revenue into last year because we knew we were hitting earnout."  In the same email, Fritts instructs Rice employees to "move as much revenue and new business to post 7/1 as possible" – *i.e.*, after the earn-out period closed – so that they would "push[] as much into next year as possible and hopefully get[] a large payout in the following year."  A month earlier, Fritts had contacted his financial advisor to confirm the mechanics of the earn-out calculation and admitted that he was "considering tanking this year so it resets the baseline EBITA [sic] back to closing EBITA [sic]," which would "guarantee[] a roughly 4mill gain in year three which would be a 40mill pay day."

8.      In other words, there is no innocent explanation for Fritts's misconduct.  Not only did Fritts know what impact his actions would have; he was continuously searching for ways to underhandedly increase his earn-outs.  Fritts's deception has had an impact even beyond the overstated earn-outs.

9.      By developing his scheme before he even signed the APA, Fritts fraudulently induced PCF to enter that agreement.  Had PCF been aware that Fritts intended to inflate the earn-outs, PCF would not have agreed to purchase the business on the terms it did.  Moreover, because Fritts paid over 100 of Rice's employees off-book, with no documentation of their compensation arrangements, PCF must now renegotiate their compensation or risk losing them to competitors.  As a result, Rice's assembled workforce, which was a major part of what PCF acquired in the sale, is now at risk of leaving because of Fritts's scheme.  PCF has also learned that, in violation of his agreement not to compete with PCF, Fritts purchased books of business from other brokers in the name of RI Insurance Services, LLC, the entity that sold PCF the Rice Insurance business.  This misdirecting of PCF's rightful business opportunities has

further harmed its business. In sum, Fritts has hindered PCF's ability to run its business and has significantly devalued the business PCF acquired.

10.    PCF brings this action to recover the substantial damages that it has incurred and will incur because of Fritts's disloyal and deceptive conduct. Fritts's disloyal conduct continued after he was put on leave. He obstructed PCF's investigation into his fraud while on leave. Despite PCF's instructions to the contrary, Fritts continued to contact Rice employees in an attempt to cover his tracks. In addition, some Rice employees have expressed concern that Fritts will retaliate against them if they cooperate with PCF's investigation. Thus far, PCF has uncovered evidence that it overpaid the first-year earn-out by over $19 million; however, as PCF unravels the fraud, it expects that its damages will be much higher.

## PARTIES

11.    Plaintiff PCF Insurance Services of the West, LLC ("PCF") is a Delaware limited liability company that owns and operates over 140 insurance agencies across the country. PCF's principal place of business is located in Lehi, Utah. PCF is a party to the APA, whereby PCF acquired substantially all of the operations and assets of RI Insurance Services, LLC (f/k/a Rice Insurance, L.L.C.) (the "Sale"). PCF is a citizen of Delaware and Utah.

12.    Defendant RI Insurance Services, LLC ("RI Insurance" or "Seller") is a limited liability company organized under the laws of Washington. RI Insurance was formerly known as Rice Insurance, L.L.C. It changed its name sometime after the Sale. RI Insurance operated an insurance brokerage business in Washington. Upon information and belief, it has continued some of its operations after the Sale, sometimes still under its former name. RI Insurance, as a successor in interest to Rice Insurance, L.L.C., is a party to the APA. RI Insurance is a citizen of Washington.

COMPLAINT

- 5 -

13.     Defendant James Fritts is a controlling member and principal officer of RI Insurance.  Fritts is a former employee of PCF.  While employed by PCF, Fritts held the titles of Producer and Principal of Rice Insurance.  Fritts is a citizen of Washington.

## JURISDICTION AND VENUE

14.     In the APA, the parties consented to jurisdiction in Washington, and Washington law governs the APA.  Section 15(a) of the APA states:

> This Agreement shall be governed by, and construed under, the laws of the State of Washington, and all rights and remedies shall be governed by said laws, without regard to principles of conflicts of laws. To the fullest extent permitted by law, the Parties hereto agree that any claim, suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the other agreements or transactions contemplated hereby shall only be brought in the state courts in the State of Washington or the Federal courts in each case located in the State of Washington…and each of the Parties hereby consents to the jurisdiction of such courts…in any such suit, action or proceeding….

15.     This Court has personal jurisdiction over Fritts because he is a resident of Washington.  In entering into the APA, Fritts and RI Insurance consented to jurisdiction in Washington.  Both Fritts and RI Insurance have irrevocably waived any right to a jury trial in any action arising out of or related to the Sale.  (APA § 15(b))

16.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Counts IX and X assert claims that arise under Sections 1962(c) and (d) of Title 18 of the United States Code, and the remaining counts assert claims arising from the same set of facts. This Court also has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between PCF and Defendants, and the amount in controversy far exceeds $75,000, exclusive of interests and costs.

COMPLAINT

- 6 -

1

2

## FACTUAL ALLEGATIONS

**PCF's Partnership Model.**

3

4

5

6

7

8

9

10

11

17.    Started in 1987 as a single local insurance agency, PCF has now grown into a robust network of over 140 agencies in over 270 locations across the country.  PCF is first and foremost propelled by its people.  It uses a unique partnership model that allows the partner agencies it acquires to share in a collective network of success by inviting entrepreneurship, bolstering resources and aligning partners through equity ownership.  The PCF model celebrates a balance of autonomy and synergy so that its partner agencies can continue operating their businesses as they have, while attaining access to best-in-class shared services and growth resources.

12

13

14

15

16

17

18

18.    Consistent with this vision, when PCF acquires an agency, it retains the leaders and offers them incentives to continue growing their businesses.  One of those incentives is the opportunity to earn bonus payments in the first few years following the acquisition.  These "earn-outs" reward PCF's partners by allowing them to share in the profits they are building.  PCF has achieved remarkable success by aligning the interests of its investors and management with the people who are running its agencies.

19

20

21

22

23

19.    When PCF acquired Rice in 2021, PCF believed it had partnered with someone who shared its vision and integrity.  Excited by Rice's prospects, PCF offered Rice's Principal, James Fritts, a generous earn-out opportunity.  If Rice continued to grow, Fritts would earn a bonus payment in each of the first five years following the acquisition.

24

25

26

27

28

20.    Not content to earn those bonuses honestly, Fritts devised and orchestrated a plan to manipulate the financial records of Rice to artificially inflate the earn-outs PCF would pay.  Fritts developed this plan before he even signed the APA, and he enlisted the aid of Rice's Controller, Rick Heerspink, and others to carry out his scheme.

COMPLAINT

- 7 -

**PCF Purchases The Rice Business And Retains Fritts To Continue Running It Post-Sale.**

21.    On July 15, 2021, PCF, RI Insurance, Fritts and Seller's other equity owners (together with Fritts, the "Seller Principals") executed the APA.  The parties agreed that the APA would be effective as of July 1, 2021 (the "Effective Date").

22.    Unaware of Fritts's fraudulent plans, PCF agreed to purchase substantially all of the operations and assets of Seller's business for approximately $226 million in combined cash and equity interests in PCF.  Both the cash and equity components of the consideration were paid to the Seller Principals.

23.    The Seller Principals appointed Fritts to act as their agent, representative and attorney-in-fact for all purposes and with respect to all matters arising under the APA.  Fritts's authority as "Seller Representative" included the power and authority to carry out the purposes and intent of the APA.  (APA § 23(a))  Fritts was a party to the APA in his individual capacity, as a Seller Principal, and as the Seller Representative.  Simultaneously with the APA, PCF and Fritts also executed an employment agreement for Fritts to continue managing the Rice business following the Sale.

24.    Also on July 15, 2021, PCF and RI Insurance executed a Transition Services Agreement (the "TSA," attached hereto as Exhibit B), pursuant to which RI Insurance agreed to provide PCF certain specified services (generally relating to operation of the transferred business) on a transitional basis commencing on July 15, 2021.  In relevant part, the TSA required RI Insurance to provide all such transition services "in good faith, in accordance with applicable law and in a manner generally consistent with the historical provision of the Services in the operation of the Company Business and with the same standard of care as historically provided."  (TSA § 1.02)  Fritts signed the TSA on behalf of RI Insurance.

COMPLAINT

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7097
+1 206 839 4300

25.     Among other things, the TSA required Rice to operate that portion of the Company Business (as that term is defined in the APA) not immediately transferred to PCF in the ordinary course of business consistent with past practice, and to provide payroll services for transferred employees in a consistent manner with past practice.  (*Id.*, TSA, Services Exhibit §§ I & V)

26.     In connection with PCF's purchase of Seller's business, Fritts made a series of representations and warranties regarding the business.  Among other things, Fritts represented that Seller maintained no off-the-books accounts.  (APA § 4.2(z))  He also represented that they had accurately disclosed a true, complete and accurate list of all of Seller's officers, directors, consultants and employees.  (*Id.* § 4.2(n))  Fritts further represented that no statements, documents or certificates furnished by Seller contained or would contain any untrue statement of material fact or omitted or would omit any material fact necessary to make the statements not misleading.  (*Id.* § 4.2(dd))  Fritts represented that Seller was the sole record and beneficial owner of all of the acquired assets, and that it had sole, good and marketable title to those assets, free and clear of all security interests.  (*Id.* § 4.2(e))  Fritts also represented that Seller had no liability or obligation to pay any fees or commissions other than those specifically disclosed in connection with the transaction.  (*Id.* § 4.2(aa))

27.     In addition to these representations, Fritts, as well as Seller, agreed not to carry on any business that competed with the Rice Insurance business that PCF now owned.  (*Id.* § 9.1(c))  Section 9.1(c) of the APA provides, in relevant part:

> Except as an agent of Purchaser, on behalf of Purchaser or with the prior written consent of Purchaser, **each Seller Party [including Seller and Fritts] will refrain from Carrying on a Business**, directly or through another under a Seller Party's supervision or control, **which provides any Company Business within the Restricted Territory. . . .** The term "Carrying on a Business" shall mean to engage (including by way of solicitation of any Client or accepting any offer to provide Company Business to any Client) in any such Company Business (other

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7097
+1 206 839 4300

than on behalf of Purchaser) as a sole proprietor, partner, member of a limited liability company, officer, director, employee, stockholder or similar capacity.

(*Id.* § 9.1(c)) "Company Business" means "the business conducted by Seller, including, without limitation, quoting, placing, providing, servicing, and/or renewing Insurance Products or Services." (*Id.* § 24)

**Under The APA, PCF Offers Fritts The Chance To Earn Bonus Payments If Rice Continued To Grow.**

28.     To incentivize Fritts and the other employees working at Rice to grow their business, PCF agreed under the APA to pay potential earn-out bonus payments if Rice reached certain earnings growth targets. In each of the first five years following the sale, Seller would be entitled to an Earn-Out Payment if Rice's EBITDA was a designated percentage above its Closing EBITDA.[2]

29.     The multiple for the first year earn-out was the most lucrative opportunity for Fritts. At the end of the first year following the Sale, if Rice's EBITDA was greater than three percent over its Closing EBITDA, PCF would pay an Earn-Out Payment equal to ten times (10x) the amount of that growth. (APA § 2.1(c)(ii)) In subsequent years, Rice would have to reach higher growth targets to achieve the 10x multiple.

30.     The Earn-Out Payments would be paid as directed by Fritts.

**Before Even Signing The APA, Fritts Concocts A Scheme To Manipulate The Earn-Outs.**

31.     Before even signing the APA, Fritts began to look for ways to artificially increase Rice's earnings to take advantage of the 10x multiple for the year one earn-out. In a June 24, 2021 email to Heerspink, Fritts instructed Heerspink to make sure that any commission checks they received before the closing date would be booked on the Seller

---

[2] After the first year, the APA requires Rice's EBITDA to also be a designated percentage above the prior year's EBITDA.

COMPLAINT

- 10 -

entity's books and not Rice's. A few minutes later, however, Fritts changed his mind: "Ignore that.. I would rather have it hit the earn out … why take a dollar today when it is worth 10x in the earn out … attorneys just elaborated." Fritts knew he could significantly increase his Earn-Out Payments by timing the recognition of revenue so that it fell within the Earn-Out Period, even though it had been earned before the Earn-Out Period began.

32.    Beginning before the APA was signed, Fritts made it his mission to inflate Rice's earnings as high as possible in the first year to take advantage of the earn-out. As one Rice employee explained, "The first year I was told often, 'Just think about the 10x. Just think about the 10x.' … And to me in my seat today it's pretty obvious what that motivation was and why this happened. We are gunning for this 10x and to make this number as big as possible. And that got said to me a lot."

**Fritts Agrees To Cooperate In The Calculation Of The Earn-Out Payments.**

33.    The APA provided that, following the anniversary of the closing date, PCF would estimate Rice's EBITDA for purposes of determining whether any Earn-Out Payment was due. PCF calculated Rice's Estimated Earn-Out EBITDA in reliance on the Rice financials and financial data that had been manipulated by Fritts in Washington and transmitted interstate to PCF's corporate headquarters in Utah. PCF was required to calculate Rice's Estimated Earn-Out EBITDA and provide that calculation to Fritts. The earn-out provisions also obligated Fritts to "cooperate and assist in good faith in the preparation of the Estimated Earn-Out EBITDA … including making available, to the extent reasonably necessary, books, records, work papers and personnel at such reasonable times as any Party shall request…." (APA § 2.2(e))

34.    Each Earn-Out Period would run from July 1 through June 30. At the end of each Earn-Out Period, Fritts and Heerspink would prepare a pro forma income statement

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7097
+1 206 839 4300

listing Rice's total revenues and expenses for the period. Fritts (or Heerspink, at Fritts's direction) would provide the pro forma to PCF, which PCF used to calculate the Estimated Earn-Out EBITDA.

35. As PCF has since learned, the pro formas that Fritts and Heerspink provided to PCF to calculate the Earn-Out Payments significantly overstated Rice's earnings. Although PCF could look to Rice's financial and payroll records to confirm the information provided in the pro formas, Fritts deliberately manipulated those records to conceal the overstated earnings from PCF. PCF has only recently begun to learn the extent of Fritts's fraud, and it is staggering.

**Fritts Manipulates Rice's Financial Records In Order To Increase His Earn-Out Payment.**

36. Fritts manipulated Rice's books and records in at least three ways: (i) he pulled revenue into the Earn-Out Period even though it was earned outside of that period; (ii) he pushed off the recognition of expenses until after the Earn-Out Period closed; and (iii) he hid expenses off the books to boost earnings.

Fritts Convinces Employees To Temporarily Forfeit Compensation

37. One aspect of Fritts's plan involved making side agreements with Rice's producers where they would forfeit portions of their compensation and wait to be repaid until PCF had paid the year one earn-out. As an insurance business, Rice's largest expense by far is employee compensation. Reducing that expense on Rice's books would have a huge impact on the First Earn-Out Payment; for every dollar of compensation excluded from that expense, Fritts would earn $10 in the Earn-Out Payment. Fritts could then use the proceeds of the Earn-Out Payment to repay employees whatever they had forfeited.

38. Messages between Rice employees in May 2022 show that Fritts used the prospect of the earn-out to convince employees to forfeit their compensation:

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington 98104-7097
+1 206 839 4300

Employee E:  I've given up 27k in overages so far

Employee 1:  damn, any word on how the earn out is looking as of right now?

Employee E:  NOt as of recently.  The last time I talked to james he was still confident we'd get at least something, and all this stuff still applies (10k on what I've forfeited)

Employee 1:  what does 10k what you've forfeited mean?

Employee E:  SOrry I meant 10x

Employee E:  Basically this additional voluntary reduction in pay (the 27k I've given up from March – now).  First year only we are guaranteed 10x on our payout for the earnout.  So let's say my final # is 27k that i gave up in overages, I'll get an addtl 270k on the earn out

39.      In other emails, Fritts admitted that producers did not take all of their owed commissions in the first year "to get the 10x earnout on it."

Fritts Maintains A Separate And Secret Set Of Books That PCF Does Not Have Access To

40.      Another part of Fritts's plan to manipulate the earn-outs involved hiding expenses in separate systems and bank accounts that PCF was not aware of.  An accountant at Rice explained that Rice maintains two divisions of its accounting system, AMS360.  "Pre-acquisition everything ran through one set of books….  After the acquisition, the majority of things ran through one book and small subset of things ran through another book."  This second division of AMS360 was called Rice Legacy.  The Legacy division of AMS360 was used to hide expenses from PCF.

Fritts Authorizes A Separate Payroll System Outside Of PCF's System

41.      Fritts also hid expenses by using a second payroll system, outside of PCF, to compensate certain employees.  Before the Sale, Rice used a third-party payroll system called Paylocity.  In negotiating the APA, Fritts asked if he would be allowed to continue to run his own payroll, but he was told all employees would have to transition to PCF's payroll system, PayCom (and later to Dayforce).  PCF management had access to PayCom and Dayforce and

COMPLAINT

- 13 -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7097
+1 206 839 4300

could confirm employee compensation through those systems.  By the end of 2021, they believed that Rice had transitioned all of its employees to PayCom/Dayforce.  However, PCF did not know that Rice actually had never stopped using Paylocity.  Although Fritts had agreed to transition everyone to PayCom, certain employees were still being compensated through Paylocity in order to hide their compensation from PCF.  Rice's human resources manager has explained that, in addition to their profiles in Dayforce, every new hire at Rice has a shell profile created in Paylocity.  Certain employees receive all of their compensation through Paylocity, and year-end bonuses were paid out of Paylocity for *all* employees.

42.    According to an accountant at Rice, Paylocity generates journal entries for all paychecks paid out of its system.  But those journal entries are not posted to the regular AMS360 division that PCF can access.  PCF has now learned that **over 100** Rice employees receive at least a portion of their compensation through Paylocity.

43.    Rice's officers were well-aware that maintaining a separate payroll was wrong. One internal message reveals Heerspink discussing it with another Rice employee:

Heerspink:    i ran our side payroll btw

Heerspink:    check should deposit friday

Employee 2:  awe thanks

Employee 2:  I like how you call it a side payroll

Employee 2:  like its shady

Heerspink:    it is

Heerspink:    james might as well just pay us in straight cash

Heerspink:    i want him to do the rounds once a month with little envelopes of cash like its drug money

Employee 3:  yes please

COMPLAINT

- 14 -

44.     Rice's human resources manager recounted an incident where two employees who were paid solely through Paylocity for their first six months were then onboarded to PCF's system.  When Heerspink learned that PCF had been made aware of their existence, he instructed the manager to have the employees removed from PCF's system.  Heerspink instructed her to lie to PCF and say that the employees had not yet been hired.  Emails between Heerspink and the human resource manager confirm that instruction.

Fritts Maintains A Separate Bank Account In RI Insurance's Name To Pay Expenses

45.     Another way Fritts hid expenses was by maintaining a separate bank account under the name of RI Insurance.  When PCF purchased RI Insurance's assets, it also purchased its bank accounts, including several accounts through Heritage Bank and one trust account through Key Bank.  However, PCF has since learned that RI Insurance had another account with Key Bank that existed before the Sale but that was not disclosed in the disclosure schedules to the APA (the "Key Bank Account").  Fritts and Heerspink are the sole authorized signers on the Key Bank Account and thus had exclusive control over payments made out of the account.

46.     Fritts decided before he signed the APA that he would keep the Key Bank Account open.  But Fritts lied and told PCF that the account was "not actively used for business purposes," even though he knew that he planned to use it to cover business expenses.  According to a Rice accountant, this "was where they would run these expenses that they didn't want to hit the PCF books.  James or Rick would tell [us] what to pay out of there.  So things like, there were still credit cards that PCF wasn't aware of through Bank of America and [someone on the accounting team] would run those expenses.  I would run reimbursements, meals, payroll."

COMPLAINT

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7097
+1 206 839 4300

47.     This secret Key Bank Account was used to pay for a litany of expenses related to Rice's business, including employee and producer compensation, office leases, equipment and office expenses, general and administrative expenses, attorneys' fees, meals and entertainment, travel expenses, marketing campaigns, employee trainings and taxes. Those expenses were not recorded anywhere on Rice's books. Indeed, the day after the Sale closed, Fritts emailed employees, instructing them that "all invoices for tail coverage for all policies … need to get paid out of the Key Bank account and I don't think we want them billed in AMS." A few months later, Heerspink indicated that he had removed certain expenses paid through the Key Bank Account from Rice's financial statements. In that same email, Heerspink explained that the reduction in expenses would impact PCF's EBITDA calculation for purposes of the earn-out.

48.     Other internal Rice emails also show that the purpose of concealing expenses through the Key Bank Account was to manipulate the earn-outs. As Fritts explained to one producer, "5k can be 50k in earn out proceeds so that's why we want to be cautious with our spending and when we do things like this pay it out of another account off the books." If Fritts believed Rice was on course to meet its earn-out growth target, he would authorize more expenses to be paid through the Key Bank Account. On the other hand, if he suspected that Rice was not going to meet the growth target, he would instruct employees "to pay out of PCF."

**Unaware Of Fritts's Conduct, PCF Calculates And Pays The First Earn-Out Payment.**

49.     Through his secret systems and accounts, Fritts kept PCF in the dark regarding his scheme to manipulate the Earn-Out Payments. Relying on the accuracy of Rice's financial records and assuming that they completely and accurately reflected Rice's revenues and

COMPLAINT

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7097
+1 206 839 4300

expenses, PCF used those records to verify the pro forma Heerspink provided for the First Earn-Out Period and to calculate the Estimated Earn-Out EBITDA.

50.     In addition, Fritts and Heerspink deliberately concealed "missing draws/commissions" when negotiating adjustments to the pro forma with PCF.  Heerspink convinced Fritts to forgo seeking some adjustments because they would alert PCF to the missing expenses:  "[W]e'd only get an adjustment for that if they catch the rest of the missing draws/commissions. … For reference, the total amount of draws/commissions expense missing that's sitting on the balance sheet is about $1.6 million thru 6/30."

51.     Unaware that Fritts had manipulated Rice's books and concealed draws/commissions expense, PCF timely provided Fritts with a statement setting forth the Estimated Earn-Out EBITDA calculation.  On September 16, 2022, PCF paid $43 million in cash and equity to Fritts and the other Seller Principals.

**Fritts's Fraud Continued Into The Second Earn-Out Period.**

52.     Having gotten away with his scheme during year one, Fritts continued to manipulate Rice's financial records in year two.  In a March 2023 email to the other Seller Principals, Fritts noted that he was not anticipating meeting the growth target for the second year earn-out.  Fritts explained why:

> Just so everyone understands why we are not hitting it… came down to having a really huge contingency year the prior year and this year being a dud, also **pushed a lot of expenses into this year which benefited last years [sic] earnout as well as pushed a lot of July revenue into last year because we knew we were hitting earnout** which hurt this year.

53.     Because Fritts anticipated missing the growth target in year two, he searched for a way to maximize the Third Earn-Out Payment instead.  In an email to his financial advisor, Fritts admitted that he was "considering tanking this year so it resets the baseline EBITA [sic] back to closing EBITA [sic] plus 9% (three years) and killing it in year 3."  Fritts

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7097
+1 206 839 4300

1   estimated that, if his plan succeeded, he "would be guaranteed a roughly 4mill gain in year

2   three which would be a 40mill pay day." A few weeks later, Fritts conveyed his plan to

3   employees:

4

5           FYI – it doesn't look like we are going to hit much of anything this year so **we are**
            **planning on pushing as much into next year as possible** and hopefully getting a
6           large payout in the following year. End date is 6/30 for this year's earnout so **move**
            **as much revenue and new business to post 7/1 as possible**.

7           54.     A few months later, Fritts had changed his mind: "FYI – looks like we have a

8   good shot at hitting it so let's push as much rev into June as possible." One of Rice's

9   accountants recalled this shift in thinking. "So, this last year we didn't perform as we were

10  expecting to for a lot of the year, and so James and Rick waffled for months and months and

11  months on whether they wanted to go after the earnout ended June 30. … I want to say it was

12  right before June they decided they were gonna go for it." Before Fritts changed his mind,

13  Heerspink had deposited carrier disbursement checks into the secret Key Bank Account owned

14  by RI Insurance. But, just before the earn-out period ended, Heerspink instructed the

15  accountant to cut a check out of the Key Bank Account and deposit it into a PCF-owned

16  account. Heerspink also instructed him to enter that single check as multiple checks to hide

17  the fact that these carrier disbursements had originally been deposited into the secret Key Bank

18  Account. "So those checks that had been deposited into RI because they weren't gonna go for

19  it, and then they decided they were gonna go for it and they added up to like $300k. They

20  were like, 'This is a lot of revenue. Let's get it on the book.'"

21

22          55.     Fritts manipulated expenses in year two as well. Rice acquired at least two

23  books of business from other insurance agencies and recorded the revenues from those

24  acquisitions on Rice's books. But virtually no corresponding commission expense was ever

25  recorded. As one of Rice's accountants explained: "All of the revenue has hit and as far as the

26

27

28

COMPLAINT                                       - 18 -

books are concerned, it's 100% revenue with no commission expense."  The individual who sold one of those books of business has apparently never been paid.

56.    In addition, PCF has uncovered emails showing that Fritts intended to perpetuate his fraud for the entire five years of potential Earn-Out Payments.  As Fritts explained to employees: "We did leave enough in the Key Bank account to cover expenses and bonuses for employees for the next few years[,] which cut a decent amount out of the earnout but now that is prefunded almost until the end of the earn out period."  Fritts thus used a portion of the First Earn-Out Payment to continue funding his fraudulent scheme.

**Fritts Attempts To Cover Up His Fraud.**

57.    Two Rice employees confirmed to PCF that, in recent months, Fritts began to take particular caution to conceal his actions.  One employee described that, around the end of the Second Earn-Out Period, Fritts and Heerspink started to get worried.  Something appeared to have "spooked" them and "[a]ll of sudden there were more questions about 'hey, what is this getting paid through?  Switch it over.' 'Hey, we gotta get rid of Gary's credit card.'"

58.    Another Rice employee described an incident where she reached out to PCF human resources about the logistics for extending an employment offer to an individual on a visa.  When her supervisor learned that she had spoken to PCF management, the supervisor reprimanded her and told the employee she could not go to PCF before checking in with her first.  In a similar incident, the same employee reached out to PCF about purchasing office furniture and was reprimanded again and told to "never do that again."  Within a week of that incident, the employee had a performance review with Fritts and her supervisor who told her she was "outside of [her] bounds."  This was just a week after she had had a favorable performance review where she was told she was doing a great job.

COMPLAINT

- 19 -

**PCF Discovers That Fritts Had Been Manipulating Rice's Books.**

59.    In July 2023, PCF finally got wind of Fritts's fraudulent scheme when it learned about Rice's separate Paylocity payroll system.  A Rice employee contacted PCF payroll to inquire about his Paylocity paycheck.  Concerned after learning of an entirely separate payroll system and group of employees, PCF engaged a third-party audit consultant to conduct a targeted audit of Rice's financial statements and records.  The results of the audit revealed several categories of off-book expenses that Rice was hiding from PCF.

60.    For instance, PCF discovered that Rice was employing six individuals for a "ZoomInfo Lead Generator" initiative for whom PCF had no employment records.  PCF also discovered that Rice had stopped paying certain state and local business and occupation taxes in order to keep those expenses off the financial statements.  Rice stopped paying these taxes even though PCF's tax department explicitly instructed Rice to pay them.  PCF understands that Rice has also not recorded any expense for penalties or interest due on any unpaid taxes.

61.    The auditor also uncovered that Rice failed to record two months' worth of rent expense for one of Rice's offices.  PCF was not even aware of the existence of the lease prior to the auditor's investigation.

**Fritts Obstructs PCF's Attempt To Learn The Truth.**

62.    During the audit, Fritts obstructed PCF's access to information, in violation of his obligations under the APA.  For instance, PCF's auditor requested direct access to the Paylocity system so that it could independently verify the amounts and dates of the compensation payments and determine whether any additional employees were being paid off the books.  But Fritts refused to authorize that access.

63.    Fritts also did not allow the auditor to interview employees.  Prior to the audit, Fritts and Heerspink had already kept tight control on any information going out to PCF.  One

COMPLAINT

- 20 -

of the few other employees who had regular contact with PCF management, the human

resources manager, had been reprimanded multiple times for providing too much information

to PCF regarding Rice's employees and payroll.  When the auditors visited Rice's offices, that

individual was told not to speak to them.  At least two other employees, including a Rice

accountant, were instructed to go home on the day the auditor was conducting interviews at

Rice's offices.

**PCF Places Fritts On Administrative Leave And Continues Its Investigation.**

64.    Out of concern that it would not get to the bottom of Fritts's misconduct while

he remained in charge at Rice, PCF decided to place him on administrative leave, beginning

August 30, 2023.  PCF informed Fritts that, while he remained on leave, he was not to contact

anyone at Rice.  But Fritts ignored that directive and continued to interfere with PCF's

investigative efforts.  PCF understands that Fritts has been using a burner phone to contact

employees and has been waiting in Rice's parking lot to meet with employees to interrogate

them about PCF's investigation.  PCF also understands that Fritts attempted to remove certain

electronic accounting files from Rice to prevent PCF from accessing their contents.  PCF

requested that Fritts return his company-issued laptop, but he still has not done so.

65.    After placing Fritts on leave, PCF hired outside counsel and a forensic

accounting firm to conduct a full investigation of Rice's books and relevant documents and

communications.  The investigation team began its examination in early September.  Based on

a preliminary analysis, PCF currently estimates that, in the first year following the Sale, Rice

incurred at least $1.9 million in expenses that were never reported on its books.  Those

expenses caused PCF to overpay the First Earn-Out Payment by $19 million.  PCF continues

to investigate the fraud and believes Fritts's ill-gotten gains are much higher.

COMPLAINT

- 21 -

66.     Had PCF been aware that Fritts was already intending to manipulate the earn-outs before he signed the APA, PCF would not have agreed to the Sale. It would be impossible to unscramble the eggs now and rescind the Sale. Nevertheless, PCF has been damaged severely by Fritts's scheme. In particular, Fritts's conduct has devalued the business that PCF believed it was acquiring, and PCF is entitled to rescissory damages.

**RICO Allegations**

67.     Fritts, Heerspink and certain Seller Principals and/or members or employees of RI Insurance ("Employee A" through "Employee I," and collectively with Heerspink, the "Employees") operated an insurance brokerage business in Washington and California prior to the Sale. Fritts and certain of the Employees sold the Rice business to PCF in the Sale. Fritts and the Employees were associated prior to the Sale by virtue of their status at RI Insurance and in connection with the Rice business.

68.     As alleged herein, prior to execution of the APA, Fritts and others including the Employees determined to artificially inflate Rice's post-signing EBITDA in order to increase amounts payable in the First Earn-Out Payment, which was shared among Fritts and the Employees, and to manipulate future earnout payments under the APA.

69.     Fritts and the Employees (collectively, the "Enterprise") formed an enterprise through which members of the Enterprise conducted, among other things, the pattern of racketeering activity described herein.

70.     Members of the Enterprise took steps to intentionally misrepresent Rice's revenues and expenses and cause the delivery of inaccurate information regarding such revenues and expenses to PCF by means of interstate wire (including email and/or other electronic systems that were designed to, and did, transmit information between Washington and Utah, among other places), for the unlawful purpose of defrauding PCF by inflating the

COMPLAINT

- 22 -

First Earn-Out Payment and manipulating financial data underlying earn-out payments and

determinations for future years.

71.     Each member of the Enterprise knew of, and agreed to facilitate and advance,

the fraudulent conduct described herein.  For example:

- In an email dated October 12, 2021, Employee A asked Fritts whether a business expense should be paid out of the Enterprise's hidden bank account (the Key Bank Account, which Employee A referred to as "the fund") in order to inflate EBITDA and, accordingly, the First Earn-Out Payment.  Regarding the payment, Employee A wrote:  "I am assuming you want it to come out of the 'fund'."  Fritts then authorized payment from the Key Bank Account.

- In an email dated December 16, 2021, Fritts directed Employee B to pay for business expenses with personal funds, stating "keep the receipt and have [other members of the Enterprise] pay it back out of Key Bank" because "[e]verty [sic] 1 dollar is 10 dollars."

- In an email dated March 23, 2022, Employee C explained to another Rice employee that (s)he submitted business expenses for payment from the Key Bank Account.

- In an email dated March 23, 2022, Fritts explained to Employee D that the Enterprise would not pay certain producers in respect of accounts those producers serviced in order to inflate the First Earn-Out Payment.  Fritts wrote:  "[I]f we start paying it just hurts earnout for everyone ….  Lets just leave these at zero and capitalize on the 10x profit created by it."

- In electronic messages sent by Employee E on May 10, 2022, Employee E explained that (s)he had agreed to a voluntary reduction in pay in order to inflate the First Earn-Out Payment.  Employee E wrote:  "Basically this additional voluntary reduction in pay (the 27k I've given up from March - now). First year only we are guaranteed 10x on our payout for the earnout. So let's say my final # is 27k that i gave up in overages, I'll get an addtl 270k on the earnout … IN addition to whatever else I Was getting."

- In an email dated August 22, 2022, Fritts explained to members of the Enterprise that the Enterprise had funded its secret bank account such that it could be used to pay business expenses throughout the earn-out period under the APA.  Fritts wrote:  "We did leave enough in the Key Bank account to cover expenses and bonuses for employees for the next few years which cut a decent amount out of the earnout but now that is prefunded almost until the end of the earn out period."  Employee F responded, writing:  "Very cool to fund ahead for the employees, smart move."

- In an email to Heerspink dated December 7, 2022, Employee G authorized payment of a business expense from the Key Bank Account, which payment accordingly was not accounted for as an expense of the Rice business.

- In an email dated December 13, 2022, Employee H proposed to Fritts a method of inflating earn-out payments under the APA.  Employee H wrote:  "You wondered if there was a way to not pay a producer but take it on earnout.  This is getting complicated and it has everything to do with what you are willing to do accounting

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7097
+1 206 839 4300

wise. … Let's say we hit 10x earnout, again for clean numbers. That's $1mil of extra earnout pay that wouldn't exist otherwise."

- In an email dated May 25, 2023, Fritts explained to Employee I that certain payments should be made from PCF-affiliated accounts (and not from the Key Bank Account) because it appeared that no earn-out would be paid for the current year. Fritts wrote: "When do they need payment by? If we are not going to hit earnout I want to pay out of PCF but we wont [sic] know for 30 days or so… I assume that will be fine. Confirm?"

72.     The members of the Enterprise intended that their fraudulent scheme would continue for at least five years beyond July 2021 (which five years comprise the duration of the earn-out period of the APA). This is demonstrated by, among other things, Fritts's August 22, 2022 email explaining that the Key Bank Account was "prefunded almost until the end of the earn out period" such that it could "cover expenses and bonuses for employees" and thereby increase earn-out payments over that period.

73.     At all times relevant hereto, the Enterprise conducted substantial business throughout the States of Washington and California, among other places, which business involved, among other things, the marketing and sale of insurance products.

74.     As detailed herein, the Enterprise's racketeering activity, including fraud achieved by means of intentional financial misrepresentations and the delivery of inaccurate information regarding revenues and expenses to PCF, took place by wire transmission (among other means) between Washington and Utah, among other places.

75.     Fritts exercised substantial control over the affairs of the Enterprise by, among other things, creating and approving the unlawful scheme to manipulate Rice's EBITDA and certain earn-out payments, as described herein, directing operations of the Enterprise and of the Rice business, encouraging and directing others to take actions in service of the Enterprise's unlawful ends, including misrepresenting Rice's revenues and expenses, and other acts set forth herein.

COMPLAINT

- 24 -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington 98104-7097
+1 206 839 4300

76.     The Enterprise, RI Insurance and the Rice business have ascertainable structures separate and apart from the pattern of racketeering activity in which Fritts and others engaged.  The Enterprise is separate and distinct from Fritts, RI Insurance and the Rice business.

## COUNT I
### (Fraud In The Inducement, As To The APA)

77.     PCF realleges and incorporates the above allegations, as if fully set forth herein.

78.     Before signing the APA, Fritts developed a plan to manipulate Rice's financial records to artificially inflate Rice's earnings and boost the earn-outs that PCF would pay under the APA.  When entering into the APA, Fritts promised to cooperate and assist in good faith in the preparation of the Estimated Earn-Out EBITDA.  Fritts similarly promised to accurately maintain Rice's financial records to avoid exposing Rice and PCF to liability.  Moreover, in the APA, Fritts promised that all revenue would be booked in the "Ordinary Course of Business," as that term is defined in the APA.  All of these promises were made to PCF with the intent to deceive PCF and induce PCF into executing the APA.

79.     Fritts had no intention of fulfilling the promises noted above or of complying with the terms of the APA at the time such promises were made.  Fritts was already planning his fraudulent scheme to manipulate the Earn-Out Payments before the APA was signed.

80.     PCF did not have knowledge of the falsity of Fritts's promises or his intent not to comply with them.  Had PCF known that Fritts intended to manipulate Rice's earnings and the earn-out payments, it would not have entered the APA on the terms it did.

81.     Fritts's fraudulent promises caused harm to PCF by causing PCF to overpay for the Rice business and to enter into the APA on terms other than it would have agreed to had PCF known the truth.

COMPLAINT

- 25 -

1

2

### COUNT II
### (Fraud In The Inducement, As To The TSA)

3

82.     PCF realleges and incorporates the above allegations, as if fully set forth herein.

4

83.     Before signing the TSA, Fritts developed a plan to manipulate Rice's financial

5

records to artificially inflate Rice's earnings and boost the earn-outs that PCF would pay under

6

the APA.  Under the TSA, RI Insurance promised to operate the transferred business in good

7

faith on behalf of and in the interest of PCF.  RI Insurance further promised to provide such

8

9

services, including operating the transferred business and providing payroll services,

10

consistent with its past practice.  All of these promises were made to PCF with the intent to

11

deceive PCF and induce PCF into executing the TSA.

12

84.     RI Insurance had no intention of fulfilling the promises noted above or of

13

complying with the terms of the TSA at the time such promises were made.  Fritts controlled

14

RI Insurance.  Prior to the execution of the TSA, Fritts was already planning his fraudulent

15

16

scheme to manipulate the earn-outs and hide employees, payroll and expenses instead of

17

integrating them into the business.

18

85.     PCF did not have knowledge of the falsity of RI Insurance's promises or its

19

intent not to comply with them.  Had PCF known that Fritts intended to manipulate Rice's

20

earnings and the earn-out payments, it would not have entered the TSA on the terms it did.

21

86.     RI Insurance's fraudulent promises caused harm to PCF by causing PCF to

22

overpay for the Rice business and to enter into the TSA on terms other than it would have

23

agreed to had PCF known the truth.

24

### COUNT III
### (Fraudulent Misrepresentation/Fraudulent Concealment)

25

26

87.     PCF realleges and incorporates the above allegations, as if fully set forth herein.

27

28

COMPLAINT

- 26 -

88.     Under the APA, Fritts had an obligation to cooperate and assist in good faith in the preparation of the Estimated Earn-Out EBITDA.  Fritts was similarly obligated to accurately maintain Rice's financial records to avoid exposing Rice and PCF to liability.

89.     In direct contravention of his obligations, Fritts intentionally misrepresented Rice's revenues and expenses in the pro formas provided to PCF in connection with calculating the earn-outs.  As Principal of Rice, Fritts had the ability to control what was reported on Rice's books and records.  Fritts also knew that PCF would rely on those books and records to confirm the pro formas and calculate the Estimated Earn-Out EBITDA for purposes of paying the earn-outs.  Fritts deliberately misrepresented Rice's earnings to artificially inflate the earn-outs and gain a windfall to which he was not entitled.

90.     PCF did not have knowledge of the misrepresentation and concealment of Rice's true revenues and expenses, and justifiably relied upon Rice's intentionally misstated financial records in calculating Rice's EBITDA.

91.     Fritts's fraudulent misrepresentations and concealment caused harm to PCF by causing PCF to overstate Rice's EBITDA, and consequently pay the First Earn-Out Payment, to which Fritts was not entitled.

92.     After PCF became aware that Rice's earnings had been misstated, Fritts continued to actively conceal the extent of the harm.  During PCF's audit, Fritts obstructed PCF's access to information in violation of his obligations under the APA.

93.     Fritts's continued misrepresentation and concealment of Rice's true earnings is causing PCF harm by preventing PCF from rectifying or learning the scale of the misrepresentations, and exposing PCF to ongoing liability.

## COUNT IV
### (Breach Of Contract, As To The APA)

94.     PCF realleges and incorporates the above allegations, as if fully set forth herein.

COMPLAINT

- 27 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

95.    The APA is a valid and binding contractual agreement between PCF, RI Insurance and the Seller Principals, including Fritts.

96.    The APA was freely negotiated and made for valid consideration.

97.    The APA requires the Seller Principals, including Fritts, to "cooperate and assist in good faith in the preparation of the Estimated Earn-Out EBITDA … including making available, to the extent reasonably necessary, books, records, work papers and personnel at such reasonable times as any Party shall request…." (APA, § 2.2(e)).

98.    The APA also prohibits RI Insurance and Fritts "from Carrying on a Business, directly or through another under a Seller Party's supervision or control, which provides any Company Business within the Restricted Territory." (APA, § 9.1(c))  "Carrying on a Business" means "to engage . . . in any such Company Business . . . as a sole proprietor, partner, member of a limited liability company, officer, director, employee, stockholder or similar capacity." (*Id.*)  And "Company Business" means "the business conducted by Seller, including, without limitation, quoting, placing, providing, servicing, and/or renewing Insurance Products or Services." (*Id.* § 24)

99.    Fritts breached the APA by causing Rice to overstate its revenues and/or understate its expenses in its financial records, which PCF relied on in calculating the Estimated Earn-Out EBITDA and by deliberately obstructing PCF from obtaining information necessary to verify that Rice's financial records accurately reflected its earnings.

100.    Fritts and RI Insurance also breached the APA by acquiring books of business within the Restricted Territory in RI Insurance's name (or its former name), without PCF's permission.

101.    PCF has suffered damages as a result of Fritts's breach of his contractual obligations.

COMPLAINT

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7097
+1 206 839 4300

1
2

<u>**COUNT V**</u>
**(Breach Of Contract, As To The TSA)**

3        102.    PCF realleges and incorporates the above allegations, as if fully set forth herein.

4        103.    The TSA is a valid and binding contractual agreement between PCF and RI

5    Insurance.

6        104.    The TSA was freely negotiated and made for valid consideration.

7        105.    The TSA requires RI Insurance to operate the transferred business in good faith

8    on behalf of and in the interest of PCF.  It further requires RI Insurance to provide such

9    services, including operating the transferred business and providing payroll services,

10   consistent with its past practice.

11

12       106.    RI Insurance breached the TSA by failing to operate the transferred business

13   consistent with its past practices and by failing to provide payroll services to employees

14   consistent with its past practices.

15       107.    PCF has suffered damages as a result of RI Insurance's breach of its contractual

16   obligations.

17

18                          <u>**COUNT VI**</u>
19       **(Breach Of The Implied Covenant Of Good Faith And Fair Dealing)**

20       108.    PCF realleges and incorporates the above allegations, as if fully set forth herein.

21       109.    Pursuant to the APA, Fritts owed a duty of good faith and fair dealing to PCF.

22   Specifically, Fritts had an implied duty not to misrepresent Rice's earnings in order to

23   fraudulently inflate the Earn-Out Payments owed by PCF under the APA.  Fritts also had an

24   implied duty to operate Rice on behalf of and in the interest of PCF and consistent with past

25   practice.

26
27
28

COMPLAINT

Orrick, Herrington & Sutcliffe LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7097
+1 206 839 4300

110.    In contravention of his implied duty of good faith, Fritts intentionally and unreasonably misstated Rice's earnings and caused PCF to unknowingly overstate Rice's EBITDA in its earn-out calculations.

111.    Because of Fritts's breach of the implied covenant, PCF has been harmed as a result of Rice's misstated EBITDA (including through its overpayment of the First Earn-Out Payment). Fritts's manipulative scheme has also devalued the business that PCF purchase from RI Insurance. PCF has been damaged in an amount to be proven at trial.

## COUNT VII
### (Conversion)

112.    PCF realleges and incorporates the above allegations, as if fully set forth herein.

113.    The APA entitled the Seller Principals to Earn-Out Payments if Rice reached certain earnings growth targets, calculated based on Rice's EBITDA. These Earn-Out Payments are contingent, and subject to Rice's accurate statement of its financial performance.

114.    Fritts caused Rice's EBITDA to be misstated. PCF calculated the year one earn-out to Fritts and the Seller Principals based upon Rice's misstated EBITDA, and subsequently paid Fritts and the Seller Principals an inflated Earn-Out Payment to which they were not entitled.

115.    Fritts received the inflated year one earn-out, and knowingly retained funds from PCF to which he was not entitled under the APA.

116.    Because of Fritts's actions, PCF has suffered damages in an amount to be proven at trial.

## COUNT VIII
### (Unjust Enrichment)

117.    PCF realleges and incorporates the above allegations, as if fully set forth herein.

COMPLAINT

- 30 -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7097
+1 206 839 4300

118.    The misstatement and concealment of many of Rice's expenses caused the year one earn-out calculation to be significantly overstated, substantially benefitting Fritts at the expense of PCF.  Fritts's scheme also caused PCF to overpay for the Rice business.

119.    Fritts obtained these benefits through intentional misrepresentation, deception and fraudulent concealment.  As a result, it would be unjust for Fritts to retain the benefit of the consideration under the APA or the overstated year one earn-out, which he received at the expense of PCF.

120.    Because of Fritts's actions, PCF has suffered damages in the amount to be proven at trial.

## COUNT IX
### (Violations of the Racketeer Influenced and Corrupt Organizations Act)

121.    PCF realleges and incorporates the above allegations, as if fully set forth herein.

122.    Section 1962(c) of Title 18 of the United States Code makes it illegal for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

123.    At all relevant times, Fritts was (and is) a "person" for purposes of 18 U.S.C. § 1962(c).

124.    The members of the Enterprise comprise a group of individuals associated in fact, and thus were (and are) an "enterprise" for purposes of 18 U.S.C. § 1962(c).

125.    The Enterprise was formed for the purpose of facilitating, committing, perpetuating, and concealing the fraudulent and other unlawful conduct alleged herein.

COMPLAINT

- 31 -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7097
+1 206 839 4300

126.    At all relevant times, the Enterprise was engaged in, and its activities affected, interstate commerce, because (among other things) the conduct alleged herein occurred in whole or in part in the states of Washington and Utah, and other places.

127.    Fritts agreed to and did conduct and participate in the management and operation of the Enterprise and its affairs through a pattern of racketeering activity for the unlawful purpose of defrauding PCF and/or affiliates thereof by, among other things, fraudulently overstating Rice's EBITDA and therefore causing PCF to pay the First Earn-Out Payment, to which Fritts and others were not entitled, and by misstating Rice's EBITDA for purposes of fraudulently manipulating earn-out payments for future years.

128.    Pursuant to and in furtherance of the fraudulent scheme, Fritts engaged in two or more predicate acts of racketeering by, on multiple occasions, intentionally misrepresenting Rice's revenues and expenses and causing the delivery of inaccurate information regarding such revenues and expenses to PCF, for the unlawful purpose of defrauding PCF as set forth herein.  This scheme to defraud was furthered by use of interstate wire transmission, to wit (i) the use of email; (ii) the use of online messaging services and/or text messages; and (iii) phone calls, which transmissions involved Fritts, other members of the Enterprise and/or employees and other representatives of PCF.

129.    The racketeering acts set forth herein constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5) in that they were in furtherance of a common goal, including defrauding PCF, were conducted within ten years of one another, and continued between and including, at a minimum, 2021 and 2023.

130.    As a direct and proximate result of Fritts's racketeering activities and violations of 18 U.S.C. § 1962(c), PCF has sustained significant injury in its business and property in an amount to be determined at trial.

COMPLAINT

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7097
+1 206 839 4300

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT X
### (Conspiracy to Violate the Racketeer Influenced and Corrupt Organizations Act)

131.    PCF realleges and incorporates the above allegations, as if fully set forth herein.

132.    Section 1962(d) of Title 18 of the United States Code makes it illegal for any person to conspire to violate, *inter alia*, Section 1962(c) of Title 18 of the United States Code.

133.    The members of the Enterprise conspired, together and with others, to violate the provisions of 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d), in that they knowingly agreed and conspired together to conduct or participate, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity, by, among other things, fraudulently overstating Rice's EBITDA by means of interstate wire transmissions of inaccurate financial information (among other things), and therefore causing PCF to pay the First Earn-Out Payment, to which Fritts and others were not entitled, and by misstating Rice's EBITDA for purposes of fraudulently manipulating earn-out payments for future years.

134.    As a direct and proximate result of the conspiracy described herein, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), PCF has sustained significant injury in its business and property in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, PCF requests that this Court enter judgment against Fritts and RI Insurance as follows:

(a)    award PCF money damages in an amount to be proven at trial, including treble damages as authorized by statute with regard to Counts IX and X;

(b)    award PCF rescissory damages;

(c)    award PCF all fees and expenses incurred in pursuit of this action, including attorneys' fees; and

COMPLAINT

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington 98104-7097
+1 206 839 4300

1     (d)    award such other and further relief as this Court may deem just and proper.

2

3

4    Dated: September 20, 2023          ORRICK, HERRINGTON & SUTCLIFFE LLP

5                                       By: *s/Mark S. Parris*

6                                           Mark S. Parris (WSBA No. 18370)
                                            mparris@orrick.com
7                                           401 Union Street, Suite 3300
                                            Seattle, WA  98101
8                                           Telephone:  +1 206 839 4300
                                            Facsimile:  +1 206 839 4301

9                                       SKADDEN, ARPS, SLATE, MEAGHER & FLOM
10                                      LLP

11                                      By: *s/Cliff C. Gardner*
                                            Cliff C. Gardner (*Pro Hac Vice Forthcoming*)
12                                          Cliff.Gardner@skadden.com
                                        By: *s/Paul J. Lockwood*
13                                          Paul J. Lockwood (*Pro Hac Vice Forthcoming*)
                                            Paul.Lockwood@skadden.com
14                                      By: *s/Elisa M.C. Klein*
                                            Elisa M.C. Klein (*Pro Hac Vice Forthcoming*)
15                                          Elisa.Klein@skadden.com
                                        By: *s/Matthew P. Majarian*
16                                          Matthew P. Majarian (*Pro Hac Vice Forthcoming*)
                                            Matthew.Majarian@skadden.com
17                                          One Rodney Square, 920 N. King Street
                                            Wilmington, DE 19801
18                                          Telephone:  +1 302 651 3000
                                            Facsimile:  +1 302 651 3001

19                                      *Attorneys for Plaintiff PCF Insurance Services of the*
20                                      *West, LLC*

21

22

23

24

25

26

27

28

COMPLAINT                                    - 34 -

# EXHIBIT A

**EXECUTION VERSION**

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement ("**Agreement**") is dated as of July 15, 2021 (the "**Closing Date**"), and is by and among Rice Insurance, L.L.C., a Washington limited liability company (the "**Seller**"); James Fritts, an individual ("**Fritts**"); Troy Haskell, an individual ("**Haskell**"); Brett Nebeker, an individual ("**Nebeker**"); Joe Tejeda, an individual ("**Tejeda**"); Shane VanderGiessen, an individual ("**VanderGiessen**"); Tim Welch, an individual ("**Welch**"); Derek Dickerson, an individual ("**Dickerson**"); Amelia Mendenhall, an individual ("**Mendenhall**"); Adam Dickson, an individual ("**Dickson**"); Sandie Mathewson, an individual ("**Mathewson**"; and collectively with Fritts, Haskell, Nebeker, Tejada, VanderGiessen, Welch, Dickerson, Mendenhall, and Dickson, the "**Seller Principals**" and each, a "**Seller Principal**"); PCF Insurance Services of the West, LLC, a Delaware limited liability company ("**Purchaser**"); and Fritts, solely in his capacity as the representative of the Seller Principals (the "**Seller Representative**"). Seller and Seller Principals are sometimes referred to individually herein as a "**Seller Party**" and collectively as "**Seller Parties**". Purchaser and Seller Parties are sometimes referred to herein individually as a "**Party**" and collectively as the "**Parties**". Capitalized terms not otherwise defined herein have the meaning assigned to such terms in Article 24.

## BACKGROUND

WHEREAS, Seller is located in the Bellingham, Washington area and is engaged in the Company Business within the Restricted Territory;

WHEREAS, Seller Principals are the indirect owners of all of the issued and outstanding voting equity of Seller as listed on Schedule 4.1(a), and each Seller Principal holds his or her Seller equity through the respective S-Corp SPV listed on Schedule 4.1(a);

WHEREAS, Purchaser desires to acquire from Seller and Seller desires to sell to Purchaser, substantially all of the operations and assets of the Company Business upon the terms and subject to the conditions hereinafter set forth;

WHEREAS, Purchaser desires to assume from Seller and Seller desires to assign to Purchaser, certain liabilities relating to the Company Business upon the terms and subject to the conditions hereinafter set forth; and

WHEREAS, to induce Purchaser to enter into this Agreement and consummate the transactions contemplated hereunder, each of the Seller Parties agrees to be bound by the Restrictive Covenants applicable to such Seller Party contained herein.

NOW, THEREFORE, in consideration of the representations, warranties, covenants, and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to become legally bound, agree as follows:

ARTICLE 1.   SALE OF ASSETS; ASSUMPTION OF LIABILITIES

1.1   Sale of Assets.  Subject to the terms and conditions of this Agreement, at the Closing (as defined herein), the Seller Parties, as applicable, shall sell, convey, transfer, and irrevocably assign

and deliver to Purchaser, and Purchaser hereby agrees to purchase and acquire from the Seller Parties all rights, title and interests of Seller to the Acquired Assets, free and clear of all Security Interests.

1.2    Excluded Assets.   Property or assets of Seller that are not expressly included in the Acquired Assets are excluded from the sale and shall be retained by Seller and shall include those assets set forth on Schedule 1.2 attached hereto (collectively, "**Excluded Assets**").

1.3    Assumed Liabilities.  From and after the Effective Date and on the terms and subject to the conditions contained in this Agreement, Purchaser shall assume, perform, pay and discharge only the Assumed Liabilities set forth on Schedule 1.3 attached hereto and no other liabilities or obligations whatsoever, provided however that any liability that is associated with an Acquired Asset for which Purchaser receives a benefit shall also be considered an Assumed Liability.

1.4    Excluded Liabilities.  Except for the Assumed Liabilities, Purchaser shall not assume or be required to perform, pay or discharge any of the Seller Parties' debts, obligations, liabilities and commitments, known or unknown, including, without limitation, any and all debts, obligations, liabilities or commitments relating to or arising out of the operation of the Company Business or the ownership of the Acquired Assets prior to the Effective Date, (and including, but not limited to, any debts, obligations, liabilities or commitments that may be imposed on Purchaser under a de facto merger, successor transferee, bulk sale or similar theory, absolute, contingent or otherwise), other than those that are expressly included in the Assumed Liabilities.  All such debts, obligations, liabilities and commitments that are not Assumed Liabilities are referred to as "**Excluded Liabilities**".

1.5    Certain Contracts.  Anything herein to the contrary notwithstanding, this Agreement and any instrument executed pursuant hereto shall not constitute an assignment of any contract included in the Acquired Assets if an attempted assignment or transfer of the same without the consent of the other Person party thereto or the applicable Governmental Entity would be ineffective or would constitute a breach or violation thereof so that Purchaser would not in fact receive all of the rights and benefits of Seller or such other assigning party thereunder.  If as of the Closing any such consent has not been obtained, Seller shall after the Closing use its commercially reasonable efforts to provide for Purchaser the benefits and rights under any such contract without such arrangement causing a breach or violation of such contract and Purchaser shall use its commercially reasonable efforts to assume and perform the obligations under such contract to the extent such obligations are otherwise Assumed Liabilities.

1.6    Revenue and Expense Cut-Off Dates.

(a)    Any cash that is received prior to the Effective Date and that is attributed to any Acquired Asset shall be and remain the property of Seller.

(b)    Subject to Section 1.6(e) below, any cash received on or after the Effective Date that is attributable to any Acquired Asset shall be and remains the property of Purchaser.

(c)    For any Acquired Assets that are "Agency Bill" or "Agency Fee" accounts, revenue arising from any Client Accounts (i) invoiced on or after the Effective Date or (ii) that become effective on or after the Effective Date, shall be and remain the property of Purchaser.

-2-

(d)     Any contingent revenue received on or after the Effective Date that is attributable to any Acquired Asset shall be and remains the property of Purchaser.

(e)     Notwithstanding the foregoing in subparts (b) through (d), any refunds or return premiums received from the cancellation of Seller's own insurance policies shall be and remain the property of Seller.  If Purchaser receives these amounts, it shall promptly forward such amounts to Seller.

(f)     Any cost or expense arising (i) from the operations of the Company Business prior to the Effective Date, (ii) from the transaction expenses of the Seller Parties arising from the transaction contemplated by this Agreement, and (iii) from costs and expenses of Seller arising on or after the Effective Date relating to activities or expenses that were explicitly removed from Proforma EBITDA as set forth on Schedule 7.3, shall be and remain the sole obligation of Seller or the other Seller Parties, respectively.  Any cost or expense arising from (i) the operation of the Company Business arising on or after the Effective Date, except as stated otherwise in the preceding sentence or if subject to indemnification under this Agreement, and (ii) from the transaction expenses of the Purchaser arising from the transaction contemplated by this Agreement, shall be and remain the sole obligation of Purchaser.

(g)     The operating expenses (excluding any items of expense that are Excluded Liabilities) relating to the Company Business and the Acquired Assets shall be pro-rated as of the Closing Date, with Seller liable for such amounts to the extent related to any time-period prior to the Effective Date and Purchaser liable for such amounts to the extent related to periods from and after the Effective Date.  The net amount of all such prorations shall be settled and paid on the Closing Date or included in the Net Working Capital calculation pursuant to Section 2.3(a), any post-Closing adjustments shall be made in accordance with Section 2.3, but the Parties shall endeavor to minimize the need for post-Closing adjustments.

ARTICLE 2.    PURCHASE PRICE

2.1    Cash Consideration; Equity Consideration; Earn-Out. In consideration of the purchase and sale of the Acquired Assets, and the Seller Principals entering into the Restrictive Covenants, Purchaser shall assume the Assumed Liabilities and Purchaser shall pay to Seller Parties the aggregate of the following (the "**Purchase Price**"):

(a)     *Cash Consideration*. Cash in immediately available funds in the amount of $78,208,748.40, less $144,399, as agreed upon adjustments set forth on Schedule 2.1(a) (the "**Cash Consideration**"), to be paid to Seller at Closing; provided, however, if the Net Working Capital reflected in the notice given pursuant to Section 2.3(a) is less than zero dollars ($0.00), then the Cash Consideration paid at Closing shall be adjusted downward "dollar for dollar" in an amount equal to such shortfall, and if such Net Working Capital exceeds zero dollars ($0.00), then the Cash Consideration paid at Closing shall be adjusted upward "dollar for dollar" in an amount equal to such excess.

(b)     *Equity Consideration*.  The issuance in equity from PCF Management Equity, LLC, a Delaware limited liability company, equal to $148,024,251.60 in the form of an aggregate of

72,206,952 units allocated to the Seller Parties as directed by the Seller Representative in his sole discretion prior to Closing (the "**Equity Consideration**").

(c)      *Earn-Out Payments*. During the sixty (60) month period ending on the fifth anniversary of the Effective Date, Seller shall be entitled to receive additional consideration (each an "**Earn-Out Payment**" and collectively, the "**Earn-Out Payments**") paid as directed by the Seller Representative in his sole discretion based upon the growth of the Seller's EBITDA during the applicable Earn-Out Period (as defined below), as follows:

(i)      Seller's EBITDA shall be calculated for the 12-month period (the "**Year One EBITDA**") beginning on the Effective Date and ending on the first anniversary of the Effective Date (the "**First Earn-Out Period**"), for the next 12-month period (the "**Year Two EBITDA**") beginning on the first anniversary of the Effective Date and ending on the second anniversary of the Effective Date (the "**Second Earn-Out Period**"), for the next 12-month period (the "**Year Three EBITDA**") beginning on the second anniversary of the Effective Date and ending on the third anniversary of the Effective Date (the "**Third Earn-Out Period**"), for the next 12-month period (the "**Year Four EBITDA**") beginning on the third anniversary of the Effective Date and ending on the fourth anniversary of the Effective Date (the "**Fourth Earn-Out Period**"), for the next 12-month period (the "**Year Five EBITDA**") beginning on the fourth anniversary of the Effective Date and ending on the fifth anniversary of the Effective Date (the "**Fifth Earn-Out Period**" and collectively with the First Earn-Out Period, the Second Earn-Out Period, the Third Earn-Out Period, and the Fourth Earn-Out Period, each an "**Earn-Out Period**" or, together, the "**Earn-Out Periods**").

(ii)      Following the First Earn-Out Period, so long as Year One EBITDA is greater than three percent (3%) over the Closing EBITDA, Seller shall be entitled to receive an Earn-Out Payment (the "**First Earn-Out Payment**"), if any, in the amount equal to ten (10) times any EBITDA growth over Closing EBITDA provided that such EBITDA growth is greater than three percent (3%), calculated by subtracting One Hundred Three Percent (103%) of Closing EBITDA from Year One EBITDA and, if positive, multiplying by ten (10).

(iii)      Following the Second Earn-Out Period, so long as Year Two EBITDA is both greater than six percent (6%) over the Closing EBITDA, <u>and</u> three percent (3%) over Year One EBITDA, Seller shall be entitled to receive an Earn-Out Payment (the "**Second Earn-Out Payment**"), if any, in the amount equal to the Sum of Earn-Out Components (as defined on <u>Schedule 2.1(c)</u>) for the Second Earn-Out Period, as calculated pursuant to <u>Schedule 2.1(c)</u>.

(iv)      Following the Third Earn-Out Period, so long as Year Three EBITDA is both greater than nine percent (9%) over the Closing EBITDA, <u>and</u> three percent (3%) over Year Two EBITDA, Seller shall be entitled to receive an Earn-Out Payment (the "**Third Earn-Out Payment**"), if any, in the amount equal to the Sum of Earn-Out Components for the Third Earn-Out Period, as calculated pursuant to <u>Schedule 2.1(c)</u>.

(v)      Following the Fourth Earn-Out Period, so long as Year Four EBITDA is both greater than twelve percent (12%) over the Closing EBITDA, <u>and</u> three percent (3%) over Year Three EBITDA, Seller shall be entitled to receive an Earn-Out Payment (the "**Fourth Earn-**

**Out Payment**"), if any, in the amount equal to the Sum of Earn-Out Components for the Fourth Earn-Out Period, as calculated pursuant to Schedule 2.1(c).

(vi)    Following the Fifth Earn-Out Period, so long as Year Five EBITDA is both greater than fifteen percent (15%) over the Closing EBITDA, and three percent (3%) over Year Four EBITDA, Seller shall be entitled to receive an Earn-Out Payment (the "**Fifth Earn-Out Payment**"), if any, in the amount equal to the Sum of Earn-Out Components for the Fifth Earn-Out Period, as calculated pursuant to Schedule 2.1(c).

(vii)    The Earn-Out Payments, if any, shall be paid as set forth in Section 2.2 below.

(viii)    During the Earn-Out Period, for purposes of calculating Seller's EBITDA for determination of Earn-Out Payments, (x) Purchaser will include a one-time addition of fifty percent (50%) of the Growth EBITDA during the first twelve-month period following such closing for each Add-On Acquisition, so long as such Add-On Acquisition does not have a growth based earn out component, or (y) if such Add-On Acquisition does have a growth based earn out component, then, prior to the closing of such Add-On Acquisition, the Seller Representative and Purchaser shall agree upon how Growth EBITDA will be allocated to Seller and in what amounts for such specific transaction.  As used in this Agreement, "**Add-On Acquisition**" means an acquisition target acquired by Purchaser or its Affiliate, which comes under the management of any of the Seller Principals even if such acquisition target was not introduced to Purchaser by a Seller Party.  As used in this Agreement, "**Growth EBITDA**" shall mean the growth in EBITDA of an Add-On Acquisition calculated as the increase of such Add-On Acquisition's EBITDA for the first twelve-month period after the closing of Purchaser's acquisition of such Add-On Acquisition.  For the avoidance of doubt, so long as an Add-On Acquisition has separate books maintained from Seller's books, a decrease in an Add-On Acquisition's EBITDA will not result in a reduction in Seller's EBITDA.

2.2    Earn-Out Calculation.

(a)    Within sixty (60) days of the end of each Earn-Out Period, Purchaser shall prepare and deliver to the Seller Representative a statement setting forth Purchaser's calculation of Seller's EBITDA (the "**Estimated Earn-Out EBITDA**") for the applicable Earn-Out Period. All revenue, including any commissions achieved from cross-selling with Purchaser or Purchaser's Affiliates, and the average three-year revenue from life insurance policies, shall be booked in the Ordinary Course of Business.

(b)    If the Seller Representative in good faith disagrees with Purchaser's calculation of the Estimated Earn-Out EBITDA, the Seller Representative may, within sixty (60) days after receipt of such statement (the "**Earn-Out Payment Objection Period**"), deliver to Purchaser a notice disagreeing therewith and setting forth his objections (the "**Earn-Out Payment Objection Notice**").  The Earn-Out Payment Objection Notice shall specify in reasonable detail those items or amounts as to which the Seller Representative disagrees, the basis of such disagreement and, if the disagreement relates to the calculation of amounts, the Seller Representative's calculation of such amounts.  If the Earn-Out Payment Objection Notice is not timely received by Purchaser

within the Earn-Out Payment Objection Period, Seller Principals shall be deemed to agree in all respects with the Estimated Earn-Out EBITDA as prepared by Purchaser, and such calculation shall be final and binding on the Parties.

(c)    If an Earn-Out Payment Objection Notice is timely received by Purchaser within the Earn-Out Payment Objection Period, the Parties shall, during the thirty (30) days following Purchaser's receipt of such notice, use their good faith, reasonable efforts to reach an agreement on the disputed items.  If such an agreement is reached, the Estimated Earn-Out EBITDA as so agreed shall be final and binding on the Parties.  If the Parties are unable to reach such an agreement, Purchaser and the Seller Representative, on behalf of the Seller Principals, shall jointly retain a mutually acceptable independent accounting firm of regional reputation (the "**Accountant**") to resolve any remaining disagreements.  In the event that Purchaser and the Seller Representative are not able to mutually agree on an acceptable independent accounting firm, Purchaser's primary tax accounting firm will provide two independent accounting firms of regional reputation that the Seller Representative shall select from, and if he fails to make a selection from such group within five business days of its receipt of such list of firms, then Purchaser will make the selection of the Accountant, which will be binding on all Parties.  Purchaser and the Seller Representative, on behalf of the Seller Principals, shall execute, if requested by the Accountant, a reasonable engagement letter, including customary indemnification provisions in favor of the Accountant.  Purchaser and the Seller Representative shall direct the Accountant to render a determination in writing as promptly as practicable and in any event within thirty (30) days after its retention and the Parties shall cooperate with the Accountant during its engagement and make available the records and workpapers necessary for its review.  The Accountant shall consider only those items and amounts set forth in the Earn-Out Payment Objection Notice that Purchaser and the Seller Representative have been unable to resolve, and the Accountant shall review only the records and workpapers submitted and base its determination solely on such submissions and the related computational materials.  In resolving any disputed item, the Accountant may not assign a value to any item greater than the greatest value of such item claimed by either Party or less than the smallest value for such item claimed by either Party.  The Accountant's determination shall be based on the definitions included herein and shall otherwise be made in accordance with this Agreement.  The determination of the Accountant shall be conclusive and binding upon the Parties.  The fees and expenses of the Accountant shall be borne by the Seller Representative, on behalf of the Seller Principals (on the one hand), and Purchaser (on the other hand) in proportion to the relative amounts by which their proposals differed from the Accountant's final determination. For example, if the Seller Representative claims an Earn-Out Payment is $1,000 greater than the amount determined by Purchaser and if the Accountant ultimately resolves the dispute by awarding to Seller Principals $300 of the $1,000 contested, then the costs and expenses of the Accountant will be allocated 30% (*i.e.*, 300/1,000) to Purchaser and 70% (*i.e.*, 700/1,000) to Seller Principals.

(d)    The Estimated Earn-Out EBITDA (either as agreed to by the Seller Representative and Purchaser, as deemed final pursuant to <u>Section 2.2(b)</u> above or as adjusted pursuant to <u>Section 2.2(c)</u> above) shall be final and binding on the Parties and will be referred to as the "**Final Earn-Out EBITDA**" for the applicable Earn-Out Period and used to make the final determination of the applicable Earn-Out Payment.

(e)     Purchaser and Seller Principals shall cooperate and assist in good faith in the preparation of the Estimated Earn-Out EBITDA and any Earn-Out Payment Objection Notice and in the conduct of the reviews referred to in this <u>Section 2.2</u>, including making available, to the extent reasonably necessary, books, records, work papers and personnel at such reasonable times as any Party shall request and permitting (at the expense of the requesting Party) the copying of any records or extracts thereof reasonably requested.

(f)     Promptly following the determination of the Final Earn-Out EBITDA, the applicable Earn-Out Payment, if any, shall be deemed due to Seller, and Purchaser shall pay Seller such Earn-Out Payment through a mixture of cash and equity as determined by Seller Representative in his sole discretion.  The cash component of each applicable Earn-Out Payment shall be made by wire transfer of immediately available funds to accounts designated by the Seller Representative in his sole discretion, and the equity component of each applicable Earn-Out Payment shall consist of unit issuances from PCF Management Equity, LLC allocated to the Seller Parties as directed by the Seller Representative in his sole discretion.  Notwithstanding the foregoing, (i) the amount and use of equity is subject to the approval by Purchaser's board of managers at the time of such future issuance, and (ii) the valuation of any equity used for a portion of an Earn-Out Payment shall be based upon the most recent equity valuation used by PCF Management, LLC.

(g)     Purchaser shall track expenses and revenue for the Company Business separate from Purchaser's other agency operations and use commercially reasonable efforts to operate the Company Business as a separate business unit until the expiration of the Earn-Out Periods for purposes of determining the Earn-Out Payments, if any, in accordance with Section 2.1 and 2.2.

(h)     After the Closing and during the Earn-Out Periods, Purchaser shall not, directly or indirectly, take any actions with the primary purpose and intent of avoiding or reducing any Earn-Out Payments.  The foregoing covenant shall survive the Closing until the expiration of the Earn-Out Periods.  In the event that any Seller Principal's employment is terminated for any reason during any Earn-Out Period, such termination shall not relieve Purchaser's obligation to pay any Earn-Out Payments to the extent Seller is otherwise entitled to such Earn-Out Payments in accordance with the terms of this Agreement.

(i)     For all purposes, including Tax purposes, any Earn-Out Payments contemplated by <u>Section 2.1</u> and <u>Section 2.2</u> hereto (including any Earn-Out Payments in the form of units in PCF Management Equity, LLC) shall be treated by each of the parties and all recipients thereof as an adjustment to the Purchase Price (except to the extent a portion of any payment by Purchaser is properly treated as imputed interest for Tax purposes), and the Parties will file all Tax Returns consistent with such treatment.

2.3     <u>Net Working Capital</u>.

(a)     Prior to the Closing, the Seller Representative and Purchaser shall agree on a form of a statement setting forth in reasonable detail the Net Working Capital as of the Effective Date, for the purposes of calculating any post-Closing adjustments to the Cash Consideration ("**Closing Net Working Capital Sample**").  The statement shall be set forth as <u>Schedule 2.3</u> hereto and

-7-

reflect each of the components to be included in the Net Working Capital calculation as agreed to by the Parties.

(b)    Within one hundred fifty (150) days following the Effective Date, Purchaser shall prepare and deliver to the Seller Representative a statement setting forth in reasonable detail its good faith calculation of Net Working Capital as of the Effective Date, which statement shall be prepared using the format of the Closing Net Working Capital Sample and shall be accompanied by any documentation and work papers necessary to support calculations set forth therein or as the Seller Representative shall reasonably request (the "**Closing Net Working Capital**").    The Closing Net Working Capital shall be prepared in accordance with Schedule 2.3.    Purchaser shall utilize commonplace industry accounting procedures in its calculation of the Closing Net Working Capital including the accrual of current assets and current liabilities.    If within thirty (30) days after the delivery of the Closing Net Working Capital to the Seller Representative, Purchaser and the Seller Representative agree upon the calculation of the Closing Net Working Capital calculation, then such calculation shall be deemed final and binding and the Cash Consideration shall be adjusted if at all, in accordance with Section 2.3(g); however, if the Parties do not so agree, then Section 2.3(c) and Section 2.3(d) hereof shall apply.

(c)    If the Seller Representative in good faith disagrees with any portion of the Closing Net Working Capital calculation, the Seller Representative may, within 30 days after receipt of such statement (the "**NWC Objection Period**"), deliver a written notice to Purchaser setting forth his objections thereto (the "**NWC Objection Notice**").    Any NWC Objection Notice shall specify in reasonable detail those items or amounts as to which the Seller Representative disagrees, the basis of such disagreement and, if the disagreement relates to the calculation of amounts, the Seller Representative's calculation of such amounts.    If a NWC Objection Notice is not timely received by Purchaser within the NWC Objection Period, Seller Principals shall be deemed to agree in all respects with the Closing Net Working Capital as prepared by Purchaser, and such calculation shall be final and binding on the Parties and the Cash Consideration shall be adjusted, if at all, in accordance with the provisions of Section 2.3(g).

(d)    If a NWC Objection Notice is timely received by Purchaser within the NWC Objection Period, the Parties shall, during the 30 days following Purchaser's receipt of such notice, use their good faith, reasonable efforts to reach an agreement on the disputed terms.    If such an agreement is reached, the Closing Net Working Capital as so agreed shall be final and binding on the Parties and the Cash Consideration shall be adjusted, if at all, in accordance with the provisions of Section 2.3(g).    If the Parties are unable to reach such an agreement, Purchaser and the Seller Representative shall jointly retain the Accountant in the manner set forth in Section 2.2(c) above to resolve any remaining disagreements.    Purchaser and the Seller Representative, on behalf of the Seller Principals, shall execute, if requested by the Accountant, a reasonable engagement letter or letters, as the case may be, including customary indemnification provisions in favor of the Accountant.    Purchaser and the Seller Representative shall direct the Accountant to render a determination in writing as promptly as practicable and in any event within 30 business days after its retention and the Parties shall cooperate with the Accountant during its engagement and make available the records and workpapers necessary for its review.    The Accountant shall consider only those items and amounts set forth in the NWC Objection Notice that Purchaser and the Seller Representative have been unable to resolve, and the Accountant shall review only the records and workpapers submitted and base its determination solely on such submissions and the related

-8-

computational materials.  In resolving any disputed item, the Accountant may not assign a value to any item greater than the greatest value of such item claimed by either Party or less than the smallest value for such item claimed by either Party.  The Accountant's determination shall be based on the definitions included herein and shall otherwise be made in accordance with this Agreement.  The determination of the Accountant shall be conclusive and binding upon the Parties and the Cash Consideration shall be adjusted, if at all, in accordance with the provisions of Section 2.3(g).

(e)    The Closing Net Working Capital (either as agreed to by the Seller Representative and Purchaser, as deemed final pursuant to either Section 2.3(b) or 2.3(c) above or as adjusted pursuant to Section 2.3(d) above) shall be final and binding on the Parties and will be referred to as the "**Final Net Working Capital**."  The fees and expenses of the Accountant will be allocated among the Parties in accordance with the methodology set forth in Section 2.2(c).

(f)    Purchaser and Seller Principals shall cooperate and assist in good faith in the preparation of the Closing Net Working Capital, and any Net Working Capital Objection Notice and in the conduct of the reviews referred to in this Section 2.3, including making available, to the extent reasonably necessary, books, records, work papers and personnel at such reasonable times as any Party shall request and permitting (at the expense of the requesting Party) the copying of any records or extracts thereof reasonably requested.

(g)    If Final Net Working Capital reflects that Seller's Net Working Capital as of Closing was less than zero dollars ($0.00), Seller Principals shall promptly cause Seller to pay the amount of such shortfall to Purchaser.  If Final Net Working Capital was greater than zero dollars ($0.00), Purchaser shall promptly pay the amount of such excess to Seller.  Such payment, if any, shall be made within five (5) business days after the Final Net Working Capital is determined and shall be payable by wire transfer of immediately available funds to an account designated by the Party or Parties receiving payment.

2.4    Acknowledgment of Restrictive Covenants.  Each of the Seller Parties hereby agrees to abide by his or its respective Restrictive Covenants and acknowledges and agrees that the payment of the Purchase Price shall constitute, among other things, full consideration for his and its respective Restrictive Covenants, and the associated Goodwill included in the Acquired Assets.

2.5    Allocation of the Purchase Price.  The Parties shall allocate the Purchase Price among the Acquired Assets for financial accounting and tax purposes as set forth on **Exhibit A** hereto.  The Parties acknowledge and agree that the tax allocation, if any, of Purchase Price to Restrictive Covenants shall not, in any way, limit any remedy available to Purchaser for any breach by any Seller Party of any Restrictive Covenants.  The Earn-Out Payments, if any, will be treated in accordance with Section 483 of the Internal Revenue Code of 1986 as amended, and corresponding Treasury Regulations thereunder.

ARTICLE 3.    REPRESENTATIONS AND WARRANTIES OF PURCHASER

3.1    Purchaser represents and warrants to Seller Parties the following:

(a)    Organization; Authority; Enforceability.  Purchaser is duly organized and validly existing under the laws of the State of Delaware.  Purchaser has the necessary power and authority,

and has taken all action necessary, to execute and deliver this Agreement, and all other Transaction Documents, and to perform its obligations hereunder and thereunder.  This Agreement does, and all other Transaction Documents shall, constitute the legal, valid and binding obligation of Purchaser enforceable against Purchaser in accordance with their terms, subject to the effect of receivership, conservatorship or supervisory powers of insurance regulatory agencies and subject to the effect of bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to or affecting the enforcement of creditors' rights generally and subject to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

(b)    <u>No Conflicts</u>.   The execution and delivery of this Agreement and the other documents and agreements to be executed by Purchaser as contemplated hereunder, the consummation of the transactions contemplated hereby or thereby, and the compliance with the terms and conditions hereof or thereof will not (i) contravene any provision of Law or other restriction binding upon Purchaser or contravene any order or permit applicable to Purchaser; (ii) conflict with or result in any breach of any terms, covenants, conditions or provisions of, or constitute a default (with or without the giving of notice or passage of time or both) under the charter documents of Purchaser; or (iii) conflict with, result in a breach of, constitute a default under, result in the acceleration of any obligation under, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under, any agreement, contract, lease, license, instrument, or other arrangement to which Purchaser is a party or by which it is bound.

(c)    <u>Required Filings and Consents</u>.   Subject to the adoption and approval of this Agreement by the Board of Managers of Purchaser and except for the filing of a pre-merger notification and report form by Purchaser under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "**HSR Act**"), and the expiration or termination of the applicable waiting period thereunder, the execution and delivery of this Agreement and the other documents and agreements to be executed by Purchaser as contemplated hereunder and the taking of any action by Purchaser in connection with this Agreement require no authorizations, consents or approvals of, or exemptions by, or notice to, or filings with any Governmental Entity, including, without limitation, any insurance regulatory authorities.

(d)    <u>Litigation and Claims</u>.   There is no pending or, to Purchaser's Knowledge, threatened claim, charge, complaint, demand, hearing, action, suit, arbitration, inquiry, proceeding or investigation by or before any Governmental Entity to which Purchaser is a party, which seeks to restrain, condition or prohibit the transactions contemplated herein.

(e)    <u>Brokers, Finders and Agents</u>.   Purchaser has no liability or obligation to pay any fees or commissions to any broker, finder, advisor or agent with respect to the transactions contemplated hereunder for which the Seller Parties may become liable.

ARTICLE 4.    <u>REPRESENTATIONS AND WARRANTIES OF THE SELLER PARTIES</u>

4.1    Each Seller Principal represents and warrants the following to Purchaser on behalf of himself or herself:

(a)    <u>Capitalization</u>.    Seller Principals hold of record and own beneficially all of the outstanding voting equity of Seller through their individual, respective S-Corp SPV, as set forth on <u>Schedule 4.1(a)</u>. There are no voting trusts, proxies, or other agreements or understandings with respect to the voting of the equity of Seller.  There are no options, agreements, understandings (whether exercisable now or in the future and whether contingent or otherwise) that entitle or are reasonably likely to entitle any Person to call for or require the purchase or transfer of any equity in Seller.  Each Seller Principal has formed an entity (each, an "**S-Corp SPV**"), electing to be an s-corp, for the sole purpose of holding such Seller Principal's equity in Seller.  Each S-Corp SPV owned by such Seller Principal has not other operations or purposes, except for serving to hold the Seller equity.  Each S-Corp SPV holds its equity in the Seller free and clear of all Security Interests.

(b)    <u>No Conflicts</u>.  Except as set forth in <u>Schedule 4.1(b)</u>, the execution and delivery of this Agreement, the other documents and agreements to be executed by Seller Principals as contemplated hereunder, the consummation of the transactions contemplated hereby and thereby, and the compliance with the terms and conditions hereof or thereof will not: (i) contravene any provision of Law or any other restriction binding upon Seller Principals or contravene any order or permit applicable to Seller Principals; (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of any obligation under, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under, any agreement, contract, lease, license, instrument, or other arrangement to which any Seller Principal is a party, or by which any Seller Principal is bound, or to which any Seller Principal's assets are subject; or (iii) result in the attachment, creation or imposition of any Security Interest upon any of the Acquired Assets and/or Assumed Liabilities.

(c)    <u>Required Filings and Consents</u>. Except for the filing of a pre-merger notification and report form by Fritts under the HSR Act, and the expiration or termination of the applicable waiting period thereunder, the execution and delivery of this Agreement and the other documents and agreements to be executed by Seller Principals as contemplated hereunder and the taking of any action by Seller Principals in connection with this Agreement require no authorizations, consents or approvals of, or exemptions by, or notice to, or filings with any Governmental Entity, including, without limitation, any insurance regulatory authorities.

(d)    <u>Litigation; Claims and Compliance with Laws</u>.  There is no pending or, to any Seller Principal's Knowledge, threatened claim, charge, complaint, demand, hearing, action, suit, arbitration, inquiry, proceeding or investigation by or before any Governmental Entity to which any Seller Principal is a party, which seeks to restrain, condition or prohibit the transactions contemplated herein.

(e)    <u>Accredited Investor</u>.  Either at Closing or immediately following Closing, each Seller Principal is or will be an "accredited investor" as defined under the Securities Act of 1933, as amended ("**Securities Act**"), and the regulations related thereto, and is acquiring the Equity Consideration for his own account for investment purposes only and not with a view to the resale or distribution of the Equity Consideration within the meaning of the Securities Act.

4.2    Subject to the limitations set forth in <u>Article VI</u>, the Seller Parties, jointly and severally, represent and warrant the following to Purchaser:

(a)    Organization; Authority; Enforceability.  Seller is duly organized and validly existing under the laws of the State of Washington. Seller has the necessary power and authority, and has taken all action necessary, to execute, deliver and perform this Agreement and all other Transaction Documents, and to perform its obligations hereunder and thereunder.  This Agreement does, and all other Transaction Documents shall, constitute the legal, valid and binding obligation of Seller enforceable in accordance with their terms and conditions, subject to the effect of receivership, conservatorship or supervisory powers of insurance regulatory agencies and subject to the effect of bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to or affecting the enforcement of creditors' rights generally and subject to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).  Seller has no subsidiaries and is not a party to any joint venture or partnership agreement.

(b)    No Conflicts.  Except as set forth in Schedule 4.2(b), the execution and delivery of this Agreement, the other documents and agreements to be executed by Seller as contemplated hereunder, the consummation of the transactions contemplated hereby and thereby, and compliance with the terms and conditions hereof or thereof will not (i) contravene any provision of Law or any other restriction binding upon Seller or contravene any order or permit applicable to Seller; (ii) conflict with or result in any breach of any terms, covenants, conditions or provisions of, or constitute a default (with or without the giving of notice or passage of time or both) under the charter documents of Seller; (iii) conflict with, result in a breach of, constitute a default under, result in the acceleration of any obligation under, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under, any agreement, contract, lease, license, instrument, or other arrangement to which such Seller Party is a party, or by which Seller is bound, or to which Seller's assets are subject; or (iv) result in the attachment, creation or imposition of any Security Interest upon any of the Acquired Assets or Assumed Liabilities.

(c)    Required Filings and Consents.  Except for the filing of a pre-merger notification and report form by Fritts under the HSR Act, and the expiration or termination of the applicable waiting period thereunder, the execution and delivery of this Agreement and the other documents and agreements to be executed by Seller as contemplated hereunder and the taking of any action by Seller in connection with this Agreement requires no authorizations, consents or approvals of, or exemptions by, or notice to, or filings with any Governmental Entity, including, without limitation, any insurance regulatory authorities.

(d)    Litigation and Claims; Compliance with Law.

(i)    Except as set forth on Schedule 4.2(d), there is no pending or, to any Seller Party's Knowledge, threatened claim, charge, complaint, demand, hearing, action, suit, arbitration, inquiry, proceeding or investigation by or before any Governmental Entity to which Seller is a party related to the Company Business or which affect the Acquired Assets. There are no judgments or outstanding orders, injunctions, decrees, stipulations or awards (whether rendered by a court or Governmental Entity, or by arbitration) against Seller related to the Company Business or which affect the Acquired Assets and/or Assumed Liabilities.

(ii)    Seller has conducted the Company Business in all material respects in compliance with all applicable laws, rules, regulations and ordinances.  Without limiting the

foregoing, no Seller Party has engaged in price fixing, bid rigging or any other anticompetitive activity in the conduct of the Company Business.  In connection with the conduct of the Company Business, no Seller Party has (A) directly or indirectly given or agreed or offered to give any illegal gift, contribution, payment or similar benefit to any supplier, Client, governmental official or employee or other Person who was, is or may be in a position to help or hinder Seller (or assist in connection with any actual or proposed transaction) or made or agreed or offered to make any illegal contribution, or reimbursed or agreed or offered to reimburse any illegal political gift or contribution made by any other Person, to any candidate for federal, state, local or foreign public office or exert any illegal influence; or (B) established or maintained any unrecorded fund or asset or made any false entries on any books or records for any purpose related to or otherwise affecting Seller.

(e)    Title.  Seller has sole, good and marketable title to, and are the sole record and beneficial owner of, all of the Acquired Assets (including, without limitation, all Client Accounts and Clients used or required in connection with the conduct of Company Business, and all records, files, data and other records related thereto) and may sell, transfer and assign the Acquired Assets to Purchaser pursuant to this Agreement and vest in Purchaser sole, full and complete record and beneficial ownership of the Acquired Assets.  Except as set forth in Schedule 4.2(e), the Acquired Assets are free and clear of all Security Interests and no shareholder, member, employee or any other Person or entity has any ownership interest, claim, right to solicit, or other present or contingent right or interest in or to any of the Acquired Assets.

(f)    Real Property.  Except as set forth in Schedule 4.2(f), no Seller Party owns any real property used for the Company Business.  Schedule 4.2(f) sets forth all real estate leased by Seller for the Company Business (the "**Leases**").  Except as set forth on Schedule 4.2(f), with respect to each Lease:  (i) the agreement is the legal, valid, binding, enforceable obligation of Seller and the lessor thereto and is in full force and effect in all material respects and has not been amended or supplemented in any manner since a copy thereof was delivered to Purchaser; (ii) Seller has duly performed in all material respects all of its obligations to the extent such obligations to perform have accrued; (iii)(A) neither Seller nor, to Seller's Knowledge, the lessor thereto is in breach or default thereof, and (B) no event has occurred which, with notice or lapse of time, would constitute a default, or give rise to a right of offset or a defense by Seller or, to Seller's Knowledge, lessor; (iv) neither Seller nor, to Seller's Knowledge, the lessor thereto has repudiated any material provision of the agreement; (v) such Lease is assignable by Seller to Purchaser without the consent or approval of the lessor or such lessor's consent to assignment has been obtained; and (vi) Seller enjoys quiet enjoyment of such Lease.  Seller and any of its Affiliates have complied in all material respects with all Environmental, Health, and Safety Laws, and no proceeding has been filed, commenced or threatened against Seller or any of its Affiliates alleging any failure so to comply, with respect to any real property owned or leased by Seller or any of its Affiliates and used in connection with the Company Business.

(g)    Software.  The current material software applications used by Seller in the operation of the Company Business (other than third party licensed software or "off the shelf" software) are set forth on Schedule 4.2(g) hereto ("**Seller Software**").  Seller Software, to the extent it is licensed from any third-party licensor or it constitutes "off the shelf" software, is held by Seller under valid, binding and enforceable licenses and is fully transferrable to Purchaser without any third party's consent. All of Seller's computer hardware has validly licensed software installed therein. Seller

-13-

has not sold, assigned, licensed, distributed or in any other way disposed of or encumbered Seller Software.

(h)    Insurance.    Schedule 4.2(h)(i) hereto contains a description of all policies of insurance maintained by Seller, including, but not limited to, fire and casualty, property, workers' compensation, errors and omission coverage and business interruption; all premiums have been paid when due and no default exists with respect to any of such policies and all of such policies are in full force and effect.    All such policies have been made available, together with all endorsements, amendments and riders, to Purchaser for examination and inspection.    Seller has notified all applicable insurance companies that have issued the policies listed on Schedule 4.2(h)(i) of any and all incidents, events or circumstances of which any Seller Party has Knowledge that could reasonably give rise to a covered claim under such policy.    Except as set forth on Schedule 4.2(h)(ii), there are no open or pending claims.

(i)    Taxes and Tax Returns.    Seller has filed all Tax Returns that are required to have been filed on or prior to the Closing Date by Seller or the Acquired Assets and has paid or will pay and satisfy prior to the Closing Date all Taxes, if any, which are shown thereupon as due and owing, or which otherwise are required to be paid by Seller or with respect to the Acquired Assets. All such Tax Returns are true, correct and complete in all material respects.    Seller has withheld and paid all Taxes required by applicable Law to have been withheld and paid in connection with amounts paid or owing to any employee, Producer or contractor, creditor, shareholder, or other third party.    There are no liens with respect to Taxes upon any of the assets or properties of Seller, other than with respect to Taxes not yet due and payable.    No deficiency for any Taxes has been proposed, or is expected to be proposed to the Knowledge of Seller, against Seller or with respect to the Acquired Assets, which deficiency has not been paid in full.    There is no audit, litigation or arbitration or administrative proceeding or claim asserted, pending or, to the Knowledge of Seller, threatened respecting or involving Seller, the Company Business, or any of the Acquired Assets with respect to any Tax.

(j)    Financial Statements.    Attached hereto as Schedule 4.2(j) are true, correct and complete copies of the following unaudited financial statements with respect to the Company Business (collectively "**Seller Financial Statements**"): (i) balance sheet of Seller as of December 31, 2018, together with the related statement of revenues and expenses for the twelve (12) month period then ended, (ii) balance sheet of Seller as of December 31, 2019, together with the related statement of revenues and expenses for the twelve (12) month period then ended, (iii) balance sheet of Seller as of December 31, 2020, together with the related statement of revenues and expenses for the twelve (12) month period then ended, and (iv) balance sheet of Seller as of the last day of the last full calendar month prior to the Closing Date (the "**Balance Sheet Date**"), together with the related statement of revenues and expenses for the period then ended.    Seller Financial Statements: (i) have been prepared in accordance in all material respects with the books and records of Seller; (ii) have been prepared in accordance in all material respects with Seller's past practices applied on a basis consistent with prior periods; and (iii) present fairly in all material respects the financial condition of Seller as of December 31, 2018, December 31, 2019, December 31, 2020 and the Balance Sheet Date, respectively, and its results of operations for the periods then ended, provided, however, that any debt that has not historically been recorded on the Financial Statements has been satisfied by the Seller prior to the Closing.

-14-

(k)    <u>Production Statements</u>.    Attached hereto as <u>Schedule 4.2(k)(i)</u> are Seller's production statements for the twelve (12) month period ending on the Balance Sheet Date related to the Company Business (the "**Production Statements**"), including for each of the Client Accounts the net commissions and/or fees received from or with respect to each such Client Account.  The Production Statements were produced from the books and records of Seller and are true, correct and complete in all material respects.  Except as set forth on <u>Schedule 4.2(k)(ii)</u>, since June 30, 2020 no Client Account generating more than $10,000 in annual net commissions and fees contained in the Production Statements has discontinued or materially reduced its business relationship with Seller.   No Seller Party has any reason to believe that any Client with a Client Account reflected in the Production Statements generating more than $10,000 in annual net commissions and fees intends to discontinue or materially reduce its business relationship with a Seller Party (or with Purchaser, following the Closing).   Seller's net commissions and fees, including contingencies and other revenue for the twelve (12) month period ending on the Balance Sheet Date were not less than $27,185,000  arising from the Client Accounts placed through Seller for the commissions and/or fees set forth on the Production Statements.  There are no oral or written agreements, commitments or understandings with respect to any Client Account whereby any of the commissions or fees received by Seller are being returned directly or indirectly to any Client or any other Person.  Seller has made available for inspection by Purchaser all insurance accounts, dailies, Client lists, policy expirations and renewals and all records, files and other information pertaining thereto prepared and maintained by Seller for its Clients and Active Prospective Clients related to the Company Business.

(l)    <u>Absence of Changes</u>.  Since January 1, 2020, (i) there have been no events, changes or conditions which, individually or in the aggregate, have had or would reasonably be expected to have a material adverse effect on Seller, the Company Business or any of the Acquired Assets or the Assumed Liabilities; (ii) Seller has in all material respects conducted the Company Business in the Ordinary Course of Business, including, without limitation, not accelerating the collection of any accounts receivables or commission payments or delaying the payment of any accounts payable; and (iii) neither the Acquired Assets nor the Company Business have incurred any liabilities except in the Ordinary Course of Business.

(m)    <u>No Undisclosed Liabilities</u>.   Other than the Assumed Liabilities, Seller has no liability, whether known or unknown (including, without limitation, any liability that may arise in the future from past errors, omissions or other events or existing circumstances or any liability which may arise under an alter ego, de facto control, de facto merger, successor, transferee or other similar theory), whether absolute, contingent or otherwise relating to the Company Business, except for liabilities reflected on the balance sheet of Seller as of the Balance Sheet Date and liabilities of the type set forth on such balance sheet which have arisen after the Balance Sheet Date in the Ordinary Course of Business (none of which is a liability for breach of contract or warranty or involves a tort, infringement, claim, lawsuit or environmental, health or safety matter).

(n)    <u>Employees</u>.   Schedule 4.2(n) sets forth a true, complete and accurate list showing all officers, directors, consultants and employees of Seller, including Producers (each an "**Employee**"), and the rate of compensation (and the portions thereof attributable to salary, bonus and other compensation, respectively), specifying their status as exempt or non-exempt from overtime under the FLSA, and any accrued sick leave and accrued vacation of each of such Persons as of the Closing Date. Seller has complied in all material respects and is in compliance in all

-15-

material respects with all applicable employment laws, rules, regulations, and ordinances, and Seller is not liable for any arrears of wages, Taxes or penalties for failure to comply, in all material respects, with any of the foregoing, including, without limitation, the classification of Persons as employees or independent contractors. Seller has not received a claim from any Governmental Entity to the effect that Seller has improperly classified any of the Employees as (x) exempt or non-exempt from overtime under the FLSA or (y) independent contractors rather than employees, and no basis for either such claim exists. Seller is not a party to any collective bargaining agreements.

(o)    <u>Employee Benefit Plans</u>.

(i)    With respect to each "employee benefit plan" within the meaning of Section 3(3) of ERISA, and each other compensation and benefit plan, contract, policy, program and arrangement in effect as of the date hereof, which is maintained, sponsored or contributed to by Seller (other than routine administrative procedures) in which any of the Employees or their dependents participate (each an "**Employee Plan**"), each Employee Plan has been operated and administered in all material respects in accordance with its terms and applicable Law and administrative or governmental rules and regulations, including ERISA and the Code, except to the extent any noncompliance would not reasonably be expected to result in any liability imposed upon Purchaser. Neither Seller nor any ERISA Affiliate has any outstanding liability or could reasonably be expected to incur liability under Section 430(k) of the Code and/or Title IV of ERISA (other than for the payment of Pension Benefit Guaranty Corporation premiums in the ordinary course).

(ii)    Each Employee Plan which is intended to be "qualified" within the meaning of Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service and, to Seller's Knowledge, no event has occurred and no condition exists which would reasonably be expected to result in the revocation of any such determination.

(iii)    Seller does not contribute to, or is it required to contribute or has ever contributed to, any multiemployer plan as defined in Section 4001(a) of ERISA or an employee benefit plan subject to Title IV of ERISA. No Employee Plan is subject to Title IV of ERISA or the minimum funding requirements of Section 412 of the Code or Section 302 of ERISA.

(p)    <u>Material Agreements</u>.    <u>Schedule 4.2(p)</u> lists the following contracts and other agreements related to the Company Business that, for <u>subparts (ix)</u> and <u>(x)</u> individually provide for aggregate future payments to or from Seller of $20,000 or more, of potential liabilities, (the "**Material Agreements**") to which Seller or any of its Affiliates or employees, is a party: (i) any written agreement for the provision to any Client of Company Business; (ii) any agreement which provides for the sharing of commissions, including, without limitation, with any third-party or any Affiliate, or which requires Seller (in connection with Company Business) to guarantee any amount or make a minimum payment; (iii) any agreement (or group of related agreements) with any insurance carrier, broker or agency relating to the provision of Company Business; (iv) any agreement involving the acquisition or transfer of material assets, which either (A) closed within thirty-six (36) months prior to the Execution Date or (B) pursuant to which Seller or its Affiliate has any remaining material obligations owed to the selling party; (v) any agreement (or group of related agreements) under which it has created, incurred, assumed, or guaranteed any indebtedness

-16-

for borrowed money, or under which a Security Interest has been imposed on any of Seller's assets, tangible or intangible; (vi) any employment or independent producer agreement; (vii) any agreement forming a partnership or joint venture; (viii) any agreement which requires Seller, or any employee of Seller, to refrain from competing with, or soliciting or accepting business from the clients or customers of, a Person other than Seller; (ix) any license for the software applications listed on Schedule 4.2(g) other than any such licenses that constitute "off-the-shelf" software; and (x) any other agreement which is material to the Company Business.  Except as set forth in Schedule 4.2(p), Seller has made available to Purchaser either an original or a true, correct and complete copy of each written Material Agreement described in Schedule 4.2(p).  With respect to each Material Agreement described in Schedule 4.2(p):  (1) the agreement is the legal, valid, binding, enforceable obligation of the applicable Seller Party and, to the Knowledge of Seller, the other party thereto and is in full force and effect in all material respects and has not been terminated, cancelled, amended or supplemented in any manner since being delivered to Purchaser, subject to bankruptcy and equitable remedies exceptions; (2) Seller has duly performed in all materials respects all of its obligations to the extent such obligations to perform have accrued; (3)(A) neither Seller nor, to the Knowledge of Seller, any other party thereto is in breach or default thereof, and (B) no event has occurred which, with notice or lapse of time, would constitute a material breach or default of, or permit termination, modification, or acceleration under, the Material Agreement; (4) neither Seller nor, to the Knowledge of Seller, any other party thereto has repudiated any material provision of the agreement; and (5) except as set forth in Schedule 4.2(p), the Material Agreement is assignable by Seller to Purchaser without the consent or approval of any other party.  There exist no material oral agreements with respect to the Company Business or Acquired Assets.

(q)    Transactions with Affiliates.  Except as set forth on Schedule 4.2(q), no officer, director, shareholder, member, manager, or Affiliate of a Seller Party, or any party (including a family member) related to any such officer, director, shareholder, member, manager or Affiliate, or any entity in which any such Person or individual owns any beneficial interest, is a party to any contract, agreement, arrangement or transaction with Seller or has any interest in any of the Acquired Assets.

(r)    Underwriting Risk.  No Seller Party owns, or has any investment or interest in, any captive insurance company or insurance carrier or underwriter.  No Seller Party is a party to any agreements, arrangements or understandings which would require such Seller Party to assume any underwriting risk.

(s)    Producers.

(i)    Schedule 4.2(s) is a list of all employees and independent contractors who are responsible for sales or business development of the Company Business (the "**Producers**"). For avoidance of doubt, "**Producer**", as defined herein, includes account executives that are responsible for business development and/or serve as the principal contact with any Client Account.  Except as set forth on Schedule 4.2(s), each Producer of Seller is a party to a contract that is in full force and effect and each such contract contains restrictive covenants regarding maintaining Seller's confidentiality and non-solicitation/non-acceptance of such Client Accounts post-termination of employment.

-17-

(ii)    During the 24-month period preceding the date of this Agreement, (A) to Seller's Knowledge, Seller has not hired any employee or independent contractor in violation of any restrictive covenant, non-compete agreement or non-solicitation agreement to which such employee or independent contractor is a party; and (B) no Person has made an allegation or asserted a claim that Seller or any of its Affiliates has hired any employee or independent contractor in violation of any such restrictive covenant, non-compete agreement or non-solicitation agreement.

(t)    <u>Licenses</u>.  Seller and its Producers possess all insurance and other material licenses and sublicenses, permits and other authorizations and approvals issued by regulatory and other governmental agencies and instrumentalities required for Seller to conduct Company Business as presently conducted.  <u>Schedule 4.2(t)</u> sets forth all such licenses and sublicenses held by Seller and its Producers.  Such licenses and sublicenses of Seller and its Producers are in good standing, and, to Seller's Knowledge, there are no disciplinary proceedings or investigations pending or threatened against Seller's employees or Producers.  There has been no occurrence or set of circumstances reasonably likely to give rise to any such disciplinary proceeding or investigation.

(u)    <u>Low-Rated Carrier</u>.  Except as set forth on <u>Schedule 4.2(u)</u>, to the Knowledge of Seller, Seller has placed no insurance contracts, coverages or other business in the two years from the date hereof with insurance carriers or other underwriters having an "AM Best" rating below "A-" ("**Low-Rated Carrier**").

(v)    <u>Insurance Premium Assets</u>. As of the Closing Date, Seller's Insurance Premium Assets exceed their aggregate Insurance Premium Liabilities (including premium accounts payable to insurance carriers).

(w)    <u>Client Service Agreements</u>.  Seller has in place written agreements with any and all Clients for which it currently performs services for a fee paid directly by the Client. There are no service agreements with Clients whereby Seller would be required to continue providing services, without additional compensation, to such Client after the termination effective date of the applicable service agreement.  There are no guarantees of performance at pre-defined service levels under any agreements relating to Client Accounts.

(x)    <u>Appointments</u>.

(i)    to Seller's Knowledge no grounds exist which may reasonably result in any insurance company appointment of Seller to act as an agent being revoked, limited, rescinded or terminated.  Neither Seller nor, to Seller's Knowledge, any of its Producers is a party to any agreement (oral or written) which prevents it from doing business with any insurance company, agent, or broker.  Neither Seller nor, to Seller's Knowledge, any of its Producers has bound, or committed to bind, any insurance coverage for any liability, risk, cost, or expense, or in any amount of liability, risk, cost, or expense, or upon any terms or conditions, which exceeds its binding authority in any respect.  Neither Seller nor, to Seller's Knowledge, any of its Producers is in default under any of its material obligations to any insurance company, agent or broker through which it places insurance.  <u>Schedule 4.2(x)</u> is a true and complete schedule of: (i) each insurance company, agent and broker through which Seller and its Producers have placed insurance on behalf of the Seller in calendar years 2019 and 2020 for those twenty (20) companies, agents or brokers

-18-

through which Seller and its Producers placed the largest commission on behalf of the Seller, setting forth the name of each such company, agent or broker and the total commission by each such company, agent or broker during the applicable period; and (ii) each insurance company which paid Ten Thousand ($10,000) Dollars or more of contingent commissions to Seller or its Producers on behalf of the Seller in either of such periods, setting forth the name of each such insurance company and the amount of the contingent commissions paid to Seller.

(ii)    Seller has delivered to or made available for inspection by Purchaser true and complete copies of the appointment agreements (or, in the case of any insurance company, agent or broker with which Seller has no written agreement, a true and complete written description of the arrangement between such entity and Seller) currently in effect between Seller or its Producers and each insurance company, agent and broker listed in Schedule 4.2(x) and each such appointment agreement or written description materially sets forth the terms and provisions of the agreement between Seller or its Producers and such insurance company, agent or broker as currently in effect.

(y)    Compensation Disclosure.  Since January 1, 2018, Seller and its Producers have maintained policies and procedures designed to ensure that they have disclosed to each of their customers and each group of customers as required by applicable Law, the nature and extent of all forms of compensation received by Seller or its Producers, directly or indirectly, from insurers, insurance intermediaries, or premium finance companies or other businesses in consideration for placing business with, or otherwise arranging business for, such businesses, including (but not limited to) profit sharing, sales commission sharing, contingent, supplemental, bonus, override, excess commissions or any other such similar compensation.

(z)    Disclosure Controls and Procedures.  Seller has established and maintains disclosure controls and procedures that are designed to ensure that material information relating to Seller and the Company Business is made known to the Seller Principals by others within Seller, and such disclosure controls and procedures are effective to perform the functions for which they were established.  Seller maintains no off-the-books accounts, and their assets are used only in accordance with Seller's management directives.  Since January 1, 2018, no Seller Party has been advised of: (i) any material deficiencies in the design or operation of internal controls affecting Seller's ability to record, process, summarize and report financial data; or (ii) any fraud, whether or not material, that involves management or other employees who have a role in Seller's internal controls.

(aa)    Brokers, Finders and Agents.  Except as set forth on Schedule 4.2(aa), no Seller Party has any liability or obligation to pay any fees or commissions to any broker, finder, advisor or agent with respect to the transactions contemplated hereunder for which Purchaser may become liable.

(bb)    Intellectual Property.  Schedule 4.2(bb) sets forth an accurate and complete list of all material Intellectual Property and proprietary software used by any Seller Party in the Ordinary Course of Business of the Company Business.  Such Seller Party solely owns free and clear of all Security Interests, all right, title and interest in and to, or has a valid and enforceable right to use pursuant to a license agreement all Intellectual Property set forth on Schedule 4.2(bb).

-19-

(cc)    <u>Assets used in the Company Business</u>.  The Acquired Assets constitute all of the material assets currently used to conduct the Company Business as it is presently conducted and to conduct the business as reflected in Seller Financial Statements and Production Statements.

(dd)    <u>Full Disclosure</u>.  To any Seller Party's Knowledge, no representation or warranty made by Seller, nor any statement, documents or certificate furnished by Seller, contains or will contain any untrue statement of material fact or omits or will omit to state any material fact necessary to make the statements contained herein or therein not misleading. Except as expressly set forth in Article 4, the Seller Parties do not make any representation or warranty, express or implied, at law or in equity. The Purchaser acknowledges and agrees that in entering into this Agreement, and the other Transaction Documents, the Purchaser has not relied and is not relying on any representations, warranties, or other statements whatsoever, whether written or oral, by any Seller Party or any Person acting on their behalf, other than those expressly set forth in this Agreement or any other Transaction Documents, and that the Purchaser will not have any right or remedy arising out of any representation, warranty or statement not set forth in this Agreement.

ARTICLE 5.  <u>CLOSING</u>

5.1    <u>Closing</u>.  The closing of the transaction contemplated by this Agreement (the "**Closing**") shall take place on the date hereof via the electronic exchange of counterpart signature pages.  This Agreement shall be effective as of 12:01 am Pacific Time on July 1, 2021 (the "**Effective Date**").

5.2    <u>Seller Party Deliverables</u>.  At Closing and as a condition to Closing, Seller Parties shall deliver:

(a)    Evidence that Seller has taken all necessary action required to authorize the execution and performance of this Agreement, all other Transaction Documents and the transactions contemplated under this Agreement.

(b)    Certificate dated within fifteen (15) days prior to the Closing Date from the Secretary of State of the State of Washington and to the effect that Seller validly exists and is in good standing in such jurisdiction.

(c)    Evidence of the authority and incumbency of the Persons acting on behalf of Seller in connection with the execution of this Agreement and any document delivered pursuant to this Agreement.

(d)    An executed Bill of Sale in the form of the **Bill of Sale Exhibit**.

(e)    Executed employment agreement, in the form of the **Employment Agreement Exhibit**, between Purchaser and Fritts.

(f)    Reserved.

(g)    An executed Assignment and Assumption Agreement in the form of the **Assignment and Assumption Agreement Exhibit**.

(h)    Executed documentation related to the Equity Consideration.

-20-

(i)      Copies of all consents, approvals and waivers necessary to assign the contracts listed on <u>Schedule 1.1(e)</u>.

(j)      Evidence that all Security Interests relating to the Acquired Assets have been released.

(k)      An executed Transition Services Agreement in the form of the **TSA Exhibit**.

(l)      Signatory cards for all bank accounts listed on <u>Schedule 1.1(l)</u>, as well as instructions from the financial institutions for each such bank account providing as follows: (i) granting Purchaser online access to such bank accounts, (ii) granting Purchaser the ability to transfer and withdraw funds from such bank accounts, and (iii) adding a Purchaser representative as a signatory to such bank accounts.

(m)      Executed Producer Agreements, in the form on the **Producer Agreement Exhibit**, between Purchaser and each Producer listed on <u>Schedule 4.2(s)</u>.

(n)      Evidence of binding of a five (5) year errors and omissions, directors and officers, cyber, employment practices liability, and fiduciary insurance tail policy (the "**Tail Coverage**") with a deductible and policy limit consistent with Seller's prior policy.

(o)      An executed Subordination Agreement in the form of the **Subordination Agreement Exhibit**.

(p)      A certification of non-foreign status for Seller dated as of the Closing Date and complying with the requirements of Treasury Regulation Section 1.1445-2(b)(2)

(q)      Office Leases for each of Seller's office locations (the "**Affiliate Leases**"), where the landlord is an Affiliate of a Seller Party, in terms agreeable to Purchaser, for the current office space occupied by the Company Business in the form of the **Office Lease Exhibit**.

(r)      Executed Lease Assignment (the "**Lease Assignment**") of Seller's office location in Issaquah, Washington (the "**Issaquah Lease**"), in terms agreeable to Purchaser.

All actions to be taken by the Seller Parties in connection with the consummation of the transactions contemplated hereby and all certificates, instruments, and other documents reasonably required to effect the transactions contemplated hereby, will be reasonably satisfactory in form and substance to Purchaser.  Purchaser may waive any condition specified in this <u>Section 5.2</u>.

5.3      <u>Purchaser Deliverables</u>.  At the Closing and as a condition to Closing, Purchaser shall deliver the following:

(a)      The Cash Consideration.

(b)      Executed documentation related to the Equity Consideration.

(c)      Executed employment agreement, in the form of the **Employment Agreement Exhibit**, between Purchaser and Fritts.

(d)      An executed Assignment and Assumption Agreement in the form of the **Assignment and Assumption Agreement Exhibit**.

(e)      An executed Transition Services Agreement in the form of the **TSA Exhibit**.

(f)      Executed Producer Agreements, in the form on the **Producer Agreement Exhibit**, between Purchaser and each Producer listed on Schedule 4.2(s) in the form attached as the **Producer Agreement Exhibit**.

(g)      Executed Affiliate Leases.

(h)      Executed Lease Assignment.

All actions to be taken by Purchaser in connection with consummation of the transactions contemplated hereby, and all certificates, instruments, and other documents required to effect the transactions contemplated hereby, will be reasonably satisfactory in form and substance to the Seller Representative.  The Seller Representative may waive any condition specified in this Section 5.3.

ARTICLE 6.    INDEMNIFICATION

6.1    Survival.

(a)      All of the representations and warranties of the Parties set forth in this Agreement shall survive the Closing for eighteen (18) months following the Closing Date; provided, however, that the representations and warranties contained in Sections 4.1(a), (b) and (c) and Sections 4.2(a), (b), (c), (e), (i), (n), (o), (v) and (aa) (collectively the "**Fundamental Reps**") shall survive the Closing until three (3) months following the expiration of the statute of limitations applicable to matters covered thereby, is such extension is allowable under applicable Law. Notwithstanding the preceding sentence, any representation or warranty in respect of which indemnity may be sought under this Agreement shall survive the time at which it would otherwise terminate pursuant to the preceding sentence if written notice of a claim for indemnity based on the inaccuracy or breach thereof has been given to the Party against whom such indemnification may be sought prior to such time.

(b)      Any covenant or agreement of any Party hereto that is to be performed on, before or after the Closing Date shall survive the Closing indefinitely or, if sooner, for the time period provided in this Agreement with respect to such covenant or agreement.

(c)      Any covenant or agreement of any Party hereto that is to be performed on or prior to the Closing Date and which cannot be or is not fully performed prior to the Closing Date shall survive the Closing until the earlier of (i) the date on which such covenant or agreement is fully performed; and (ii) eighteen (18) months following the Closing Date.

6.2    Indemnification by Purchaser.  Purchaser shall defend, indemnify and hold the Seller Parties and their Affiliates and their respective directors, officers, shareholders, members and employees (the "**Seller Indemnitees**"), and each of them, harmless from any Adverse Consequences resulting from or arising out of or otherwise relating to (a) any inaccurate

-22-

representation or warranty made by Purchaser in this Agreement; (b) any breach or default in the performance of any of the covenants or agreements made by Purchaser in this Agreement; (c) any claim, action or cause of action or other liability arising out of or resulting from or relating to the Assumed Liabilities; or (d) Purchaser's operation/use of the Acquired Assets following Closing, including any obligations that arise following Closing under the Issaquah Lease, provided that such Adverse Consequences are not the result of (i) any inaccurate representation or warranty made by the Seller Parties, or any of them, in this Agreement, (ii) any breach or default in the performance of any of the covenants or agreements made by the Seller Parties, or any of them, in this Agreement, or (iii) any claim, action or cause of action or other liability arising out of or resulting from or relating to the Excluded Liabilities.

6.3     Indemnification by Seller Parties.

(a)     Subject to the limitations herein, the Seller Parties shall jointly and severally, defend, indemnify and hold Purchaser and its Affiliates and their respective directors, officers, shareholders, members and employees (the "**Purchaser Indemnitees**"), and each of them, harmless from any Adverse Consequences resulting from, arising out of or otherwise relating to (i) (A) any inaccurate representation or warranty made by the Seller Parties, or any of them, in this Agreement, (B) any breach or default in the performance of any of the covenants or agreements made by the Seller Parties, or any of them, in this Agreement, and (C) any claim, action or cause of action or other liability arising out of or resulting from or relating to the Excluded Liabilities; and/or (ii) any Seller Party's ownership and operation of the Company Business and/or Acquired Assets prior to the Closing, provided that such Adverse Consequences are not the result of (i) any inaccurate representation or warranty made by the Purchaser in this Agreement, (ii) any breach or default in the performance of any of the covenants or agreements made by the Purchaser in this Agreement, or (iii) any claim, action or cause of action or other liability arising out of or resulting from or relating to the Assumed Liabilities following Closing.

(b)     The representations and warranties of the Seller Parties contained in Article 4, and the covenants of the Seller Parties contained herein, are joint and several obligations up to the Individual Cap (as defined below). Accordingly, each Seller Party will be responsible, to the extent provided hereunder up to the Individual Cap, for the entirety of any Adverse Consequences suffered by any Purchaser Indemnitee thereof as a result of a breach by any Seller Party of any such representation and warranty.

(c)     Without limiting any statutory, equitable or common law remedy that Purchaser may have for a breach of this Agreement by any Seller Party, Purchaser shall have the right, but shall not be required to, satisfy any claim for indemnification (subject to the terms and conditions contained in this Article 6) for any Adverse Consequences resulting from, arising out of or otherwise relating to such breach by, upon notice to the Seller Parties and subject to the Basket described in Section 6.3(d) below, setting off against (i) first, the amount of any Earn-Out Payment, if any, payable to any of the Seller Parties, and (ii) second, the Equity Consideration (with the same valuation as of the Closing Date), on a dollar-for-dollar basis the amount of any Adverse Consequences sustained by any Purchaser Indemnitee as set forth in this Section 6.3(c). Prior to exercising any such right of set-off, Purchaser shall prepare and deliver to the Seller Representative a statement setting forth in reasonable detail its good faith calculation of the amount required to set-off in order to satisfy the claim for indemnification (the "**Set-Off Amount**"). If, within thirty

-23-

(30) days after receipt by the Seller Representative of the statement of Set-Off Amount, Purchaser and the Seller Representative agree upon the Set-Off Amount, then such Set-Off Amount shall be deemed final and binding; however, if the Parties do not so agree, then the Seller Representative and Purchaser shall, within thirty (30) days after their receipt of such statement submit their calculations of the Set-Off Amount to binding arbitration, in accordance with the rules of the American Arbitration Association (the "**AAA**"), which arbitration shall be carried out in the manner hereinafter set forth.

(i)     The arbitration proceeding shall be before a single arbitrator selected in accordance with the rules of the AAA and shall take place at a mutually agreeable location in Seattle, Washington or such other location as agreed to by the Parties.

(A)     The award rendered by the arbitrators shall be final, binding and conclusive, and judgment may be entered upon it in accordance with applicable law in the appropriate court in the State of Washington, with no right of appeal therefrom.

(B)     Each Party shall pay its or his own expenses of arbitration, and the expenses of the arbitrator and the arbitration proceeding shall be equally shared.

(C)     Once the Set-Off Amount is determined to be final and binding as set forth in this Section 6.3(c), if the Parties agree that the Set-Off Amount is owed to Purchaser under this Article 6, the Seller Parties will have a period of thirty (30) days within which to pay Purchaser for the amount set forth in the Set-Off Amount by wire transfer before Purchaser exercises its set-off right.  In the event Purchaser so elects to exercise its set-off right, it shall first seek set-off against any Earn-Out Payment if an Earn-Out Payment is expected to be paid within the next thirty (30) days before seeking set-off against any Equity Consideration.

(d)     The Seller Parties shall not be liable for any indemnity (a) unless and until the aggregate amount subject to indemnification hereunder exceeds $1,000,000; in which case the Seller Parties shall be liable for the entirety of such indemnifiable amounts (the "**Basket**"); (b) in excess of $10,000,000 (the "**Aggregate Cap**"); and (c) in addition to limitations related to the Aggregate Cap, each Seller Principal's individual liability for indemnification shall be limited to an amount (the "**Individual Cap**") equal to fifty percent (50%) of that portion of Cash Consideration attributable to such Seller Principal, except (i) if such Seller Parties have engaged in Fraud and/or an Intentional and Willful Violation, or (ii) as set forth in Section 6.3(f) below in which case the Basket and Aggregate Cap will not apply and the Individual Cap will not apply only with respect to the Seller Principal(s) who engaged in such Fraud and/or Intentional and Willful Violation.  For the purpose of this Agreement, "**Fraud**" shall mean an intentional and willful false statement of fact made by any of the Seller Parties with actual knowledge of the falsity of such fact for the purpose in inducing Purchaser to enter into the transaction contemplated by this Agreement and which is relied by on by Purchaser in entering into the transactions contemplated by this Agreement.  "**Intentional and Willful Violation**" means the refusal or failure to perform a covenant under this Agreement provided such Seller Party who refuses or fails to perform such covenant had no intention at the time such Seller Party entered into this Agreement to perform such covenant.

-24-

(e)    Each of the Seller Parties specifically acknowledges and agrees that monetary damages will not be an adequate remedy for a breach of any of the Restrictive Covenants, and that irreparable injury will result to Purchaser and/or Purchaser's Affiliates and their respective successors in interest in the event of any such breach.  Accordingly, each Seller Party agrees that Purchaser or such other Purchaser Affiliate (as applicable) shall be entitled to equitable relief in any court of competent jurisdiction, including, without limitation, a temporary or permanent injunction, restraining and enjoining such Party, or any Person with which such Party is associated or by which such Party is employed, from further violations of such provisions, without the posting of any security or bond in connection therewith.

(f)    The Basket, the Aggregate Cap and the Individual Cap (but only with respect to Fritts) shall not apply to limit the indemnification required by the Seller Parties caused by (i) a breach of any Fundamental Rep, which shall be limited to an amount not to exceed $15,000,000 (the "**Fundamental Cap**"), (ii) the Excluded Liabilities, (iii) any Adverse Consequences, including without limitation all costs, fees, judgments, orders, injunctions, decrees, stipulations or awards associated with, or related to, the litigation or regulatory matters set forth in Schedule 4.2(d), (iv) any Adverse Consequences, including without limitation all costs, fees, judgments, orders, injunctions, decrees, stipulations or awards associated with, or related to, the open or pending claims set forth in Schedule 4.2(h)(ii), (v) arising from the Seller Parties' covenants set forth in Article 22, or (vi) any Persons claiming ownership interest to any Acquired Assets, as any Adverse Consequences arising from the foregoing activities set forth in subparts (i), (ii), (iii), (iv), (v) and (vi) of this sentence will require first dollar indemnity without any cap, except for subpart (i) that is subject to the Fundamental Cap.

6.4    Matters Involving Third Parties.

(a)    If any Seller Indemnitees or Purchaser Indemnitees (an "**Indemnitee**") entitled to seek indemnification under this Article 6 receives notice of the assertion, commencement or institution of a claim, suit, action or proceeding, or the imposition of a penalty or assessment by a third party that is not an Indemnitee (a "**Third-Party Claim**"), and the Indemnitee intends to seek indemnification hereunder for such Third-Party Claim, then the Indemnitee shall promptly provide the Party against whom such indemnification may be sought (the "**Indemnifying Party**") with written notice of such Third-Party Claim (including any written demand, complaint, petition, summons or similar document relating thereto that is then in the Indemnitee's possession), but in any event not later than thirty (30) days after receipt of notice of such Third-Party Claim.  Any delay in providing, or the failure to provide such notification, shall not affect the right of the Indemnitee to indemnification hereunder except in the event that such delay or failure extends past the applicable survival expiration date set forth in Section 6.1, or to the extent that the Indemnifying Party is materially prejudiced by the delay or failure.

(b)    In connection with any Third-Party Claim, the Indemnifying Party may elect, by written notice to the Indemnitee, to assume and control, at its sole expense, the defense of any such Third-Party Claim, and shall, at its sole expense, retain counsel (reasonably satisfactory to the Indemnitee) in connection therewith; provided, however, that the Indemnifying Party will not have such right:

-25-

(i)    unless the Indemnifying Party has acknowledged in writing, within twenty (20) days following the Indemnifying Party's receipt of notice of the Third-Party Claim, to such Indemnitee the election of the Indemnifying Party to assume the defense of the Third-Party Claim;

(ii)    unless the Indemnifying Party has provided to such Indemnitee reasonable evidence that the Indemnifying Party has sufficient financial resources to defend such Third-Party Claim;

(iii)    if such Indemnitee reasonably and in good faith believes that such Third-Party Claim would be reasonably detrimental to the reputation, relations with insurance carriers, brokers, Clients or suppliers, or business of the Indemnitee or any of its Affiliates or such Third-Party Claim involves relief other than monetary damages;

(iv)    if such Third-Party Claim involves criminal allegations; or

(v)    if an outside counsel advises the Indemnifying Party in a written legal opinion and the Indemnitee that there are actual unresolvable conflicting interests between the Indemnifying Party and the Indemnitee with respect to the Third-Party Claim.

(c)    After the assumption of such defense by the Indemnifying Party, the Indemnifying Party shall not be responsible for the payment of legal fees or expenses incurred thereafter by the Indemnitee (who may, however, continue to participate in, but not control, the defense of such Third-Party Claim with separate counsel and at its own expense other than as provided in Section 6.4(b)).

(d)    In the event that the Indemnifying Party shall assume the defense of the Third-Party Claim, it shall not settle or compromise such Third-Party Claim unless (i) the Indemnitee gives its prior written consent, which consent shall not be unreasonably conditioned, withheld or delayed; or (ii) the terms of settlement or compromise of such Third-Party Claim provide that the Indemnitee shall have no responsibility for the discharge of any settlement amount and impose no other obligations or duties on the Indemnitee (including any admission of culpability), and the settlement or compromise discharges all claims against the Indemnitee with respect to such Third-Party Claim.  The Indemnitee shall cooperate with the defense of any such Third-Party Claim and shall provide such personnel, technical support and access to information as may be reasonably requested by the Indemnifying Party in connection with such defense.

(e)    If the Indemnifying Party does not or does not have the right to undertake the defense, compromise or settlement of a Third-Party Claim in accordance with Section 6.4(b), the Indemnitee will have the right to control the defense or settlement of such Third-Party Claim with counsel of its choosing (reasonably satisfactory to the Indemnifying Party) but shall not settle or compromise such Third Party Claim without the consent of the Indemnifying Party (such consent not to be unreasonably withheld, delayed or conditioned). The Indemnifying Party will be entitled to participate in, but not control, the defense of any Third-Party Claim with separate counsel and at its own expense.  The Indemnifying Party shall cooperate with the defense of any such Third-Party Claim and shall provide such personnel, technical support and access to information as may be reasonably requested by the Indemnitee in connection with such defense.

-26-

6.5    Notice of Direct Claims.  Any claim for indemnification of Adverse Consequences under this Article 6 that is not a Third-Party Claim (a "**Direct Claim**") by an Indemnitee shall be asserted by giving the Indemnifying Party prompt written notice thereof; provided, however, that any delay in providing, or the failure to provide such notification, shall not affect the right of the Indemnitee to indemnification hereunder except in the event that such delay or failure extends past the applicable survival expiration date set forth in Section 6.1, or to the extent that the Indemnifying Party is materially prejudiced by the delay or failure.  Such notice shall describe the Direct Claim in reasonable detail, including (to the extent practicable) copies of any written evidence thereof and indicate the estimated amount of Adverse Consequences, if reasonably practicable, that has been sustained by the Indemnitee.  The Indemnifying Party will have a period of thirty (30) days within which to respond in writing to such Direct Claim.  If the Indemnifying Party does not so respond within such 30-day period, the Indemnifying Party will be deemed to have rejected such claim, in which event the Indemnitee will be free to pursue such remedies as may be available to the Indemnitee on the terms and subject to the provisions of this Article 6.

6.6    Tax Treatment of Indemnity Payments.  Purchaser and the Seller Parties will treat any indemnity payment made pursuant to this Article 6 as an adjustment to the Purchase Price for all Tax purposes.

6.7    Mitigation.  Each Indemnitee shall use commercially reasonable efforts to mitigate any Adverse Consequences for which such Indemnitee seeks indemnification under this Article 6, it being understood that any reasonable costs and expenses incurred by such Indemnitee in connection with such mitigation shall constitute Adverse Consequences that may be recovered hereunder.

ARTICLE 7.    POST-CLOSING COVENANTS

7.1    Cooperation.  Purchaser and the Seller Parties shall cooperate with each other to facilitate the orderly transfer of the Acquired Assets and Company Business to Purchaser, including but not limited to, certifying, executing or transferring all necessary documents and information to Purchaser as may be reasonably required by Purchaser. After the Closing, each of the Parties agrees to give access to the other and to provide and/or execute such documents as may be reasonably requested by the other in order to consummate the transactions contemplated hereby and hereunder.

7.2    Subordination. Following Closing, within ten (10) days of Purchaser's written request, Seller Parties will execute documentation that is required by Purchaser's lender, regarding the subordination of the Earn-Out Payments hereunder to repayment obligations to such lender. Any such subordination documentation will provide that the lender shall agree, among other terms as required by agreements between Purchaser and its lender, so long as no event of default with respect to the indebtedness has occurred and is continuing (or event which, including without limitation the payment of such payment due to Seller Parties, with the giving of notice or the passage of time, would constitute an event of default with respect to such indebtedness has occurred and is continuing), that regularly scheduled payment of the applicable Earn-Out Payment may be made to the Seller Parties.

-27-

7.3     <u>Operational Directives</u>.  The Parties acknowledge and agree that the changes in operations and management process that have been discussed, agreed upon and used to develop the calculation of the Proforma EBITDA, are as set forth in <u>Schedule 7.3</u>, and shall be implemented within fifteen (15) days of the Closing Date, unless otherwise mutually extended by Purchaser and Seller Representative through written agreement.

7.4     <u>Bank Accounts</u>.  Within thirty (30) days of Closing, Seller Parties shall coordinate with Purchaser and take all reasonable steps to provide Purchaser with access to and ownership of, including the ability to transfer, deposit, and withdraw funds, as well as the addition of a signatory on behalf of Purchaser and the removal of all signatories on behalf of any Seller Party, all bank accounts included in the Acquired Assets as listed on <u>Schedule 1.1(l)</u>.

7.5     <u>Seller Employees</u>.

        (a)     On or before the Closing Date, Seller shall take all actions necessary to terminate Seller's 401(k) plan, effective immediately prior, and subject, to the occurrence of the Closing. Seller shall take all necessary action to cause the account balances of the participants under its 401(k) plan to be fully vested and non-forfeitable upon the date on which the Seller's 401(k) plan is terminated and Seller shall be responsible for any required contributions, expenses and costs related thereto.

        (b)     Nothing contained in this Agreement (but subject to the terms of any Employment Agreement) shall be construed (i) as requiring Purchaser or any of its Affiliates to continue the employment of any specific employee of Seller, (ii) to prohibit Purchaser or any of its Affiliates from, at any time after the Closing Date, changing the compensation, title, rank or job duties of any prior employee of Seller, or (iii) as obligating Purchaser or any of its Affiliates to maintain any particular employee benefit plan.  Notwithstanding the foregoing, Purchaser intends to hire the employees of Seller upon Closing, subject the salary and benefit expectations set forth in Schedule 7.3.

7.6     <u>Aggregator Relationship</u>.  Following Closing, any costs arising between Seller and any "aggregator" or similar Person pursuant to a pre-Closing Agreement between such parties, shall be the sole responsibility of the Seller Parties. In the event of any costs or expenses arising from the termination of the aforementioned agreement, the Seller Parties shall bear such costs.

ARTICLE 8.   <u>TAXES</u>

8.1     <u>Tax Returns</u>.  The Parties acknowledge and agree that the Seller Parties shall be responsible for and shall prepare all Tax Returns of the Seller Parties for all periods, and Purchaser shall be responsible for and shall prepare the Tax Returns of Purchaser for all periods.

8.2     <u>Indemnification of Tax Claims</u>.  Any other provision of this Agreement notwithstanding: (i) each Seller Party shall jointly and severally indemnify the Purchaser Indemnitees and hold them harmless from and against any loss, claim, liability, expense, or other damage attributable to (A) Taxes (or the non-payment thereof) of any Seller Party for all taxable periods, or (B) any Taxes relating to the ownership or operation of the Acquired Assets for the taxable periods (or portions thereof) ending on or before the Closing Date; and (ii)  Purchaser shall indemnify the Seller Parties

-28-

and hold them harmless from and against any loss, claim, liability, expense, or other damage attributable to (A) Taxes (or the non-payment thereof) of Purchaser for all taxable periods, or (B) any Taxes relating to the ownership or operation of the Acquired Assets for the taxable periods (or portions thereof) ending after the Closing Date. The covenants set forth in this Article 8 shall survive for a period of sixty (60) days following the expiration of the applicable statute of limitations; and any indemnification amounts owed by each Seller Party or Purchaser pursuant to this Section 8.2 are payable to the other on a dollar-for-dollar basis from dollar one as set forth in Section 6.3.

8.3    Transfer Taxes.  All transfer, documentary, sales, use, stamp, registration and other such Taxes, and recording, filing and other fees (including any penalties and interest), incurred in connection with the consummation of the transactions contemplated by this Agreement shall be paid by such Seller Party when due, and such Seller Party will, at its own expense, file all necessary Tax Returns and other documentation with respect to all such transfer, documentary, sales, use, stamp, registration and other Taxes and fees.

ARTICLE 9.    RESTRICTIVE COVENANTS

9.1    Restrictive Covenants.  The Seller Parties acknowledge and agree that substantial and valuable assets, are being transferred to Purchaser hereunder that include Confidential Information, relationships with Clients and Active Prospective Clients, and the associated Goodwill of Seller, that the relationships which Purchaser (including as a result of this transaction) has with its employees and Producers are significant business relationships necessary for Purchaser to continue to operate the business being acquired hereunder and the Acquired Assets, and that Purchaser, as a result of this transaction, shall be engaged in providing Company Business throughout the Restricted Territory.  The Seller Parties further acknowledge and agree that Purchaser and each of Purchaser's Affiliates has a reasonable, necessary and legitimate business interest in protecting the aforesaid assets and relationships and businesses, and that the covenants set forth below are reasonable and necessary in order to protect these legitimate business interests.  The Seller Parties further acknowledge and agree that the payment of the Purchase Price, shall constitute, among other things, full consideration for such covenants, and the associated Goodwill included in the Acquired Assets. In addition, the Seller Parties acknowledge and agree that monetary damages will not be an adequate remedy for any material breach of any of the Restrictive Covenants and that irreparable injury may result to Purchaser and/or Purchaser's Affiliates, or their successors in interest (Reference is made to Section 6.3(e) hereof relating to the rights of the Purchaser's Affiliates to equitable relief for breaches of this Section 9.1).    Finally, the Seller Parties acknowledge, as contemplated as part of the terms herein, that contemporaneously with the execution of this Agreement, Purchaser shall enter into an Employment Agreement with Fritts that shall also include additional, separate restrictive covenants.  Accordingly, from and after the Closing, each Seller Party agrees to the following restrictions:

(a)    No Seller Party will, directly or through another under such Seller Party's supervision or control, use, or willfully disclose to any Person, any Confidential Information of any Seller Party, Purchaser or any Purchaser Affiliate, or any of the terms of this Agreement and negotiations relating thereto, except (i) with the prior written consent of Purchaser; (ii) to the extent necessary to comply with applicable Law or the valid order of a court of competent jurisdiction, in which event such Person shall notify Purchaser, as the case may be, as promptly as practicable

-29-

(and, if possible, prior to the making of such disclosure); (iii) as an agent of Purchaser and on behalf of Purchaser; or (iv) with respect to the terms of this Agreement and negotiations relating thereto, to Seller Parties' professional advisors who have a need to know such information, provided, however, that the Seller Parties shall ensure that confidential treatment will be accorded to such disclosed Confidential Information by their professional advisors and shall be liable for any disclosure thereof by any such advisor. In addition, Seller Principals will use commercially reasonable efforts to prevent any such prohibited use or disclosure by any agent of any such Seller Principal.

(b)     Except as an agent of Purchaser and on behalf of Purchaser, no Seller Party will, directly or through another under such Seller Party's supervision or control, (i) solicit the provision of any Company Business from; (ii) provide or accept any request to provide any Company Business to; or (iii) otherwise induce the termination or non-renewal of any Company Business to, any Client included in the Acquired Assets or any Client of Purchaser, or any other Purchaser Affiliate, with whom Seller Principals had contact during his or her employment with Purchaser, if applicable, or Seller, or with whom he or she became familiar as a result of such employment. The restrictions contained in this subsection (b) shall terminate upon the fifth anniversary of the Effective Date or, for Fritts, the later to occur of the fifth anniversary of the Effective Date or two years after his Cessation Date. As used in this Agreement, "**Cessation Date**" means that date in which any Seller Principal employed by Purchaser or an Affiliate of Purchaser ceases to be employed by such Purchaser or Affiliate of Purchaser.

(c)     Except as an agent of Purchaser, on behalf of Purchaser or with the prior written consent of Purchaser, each Seller Party will refrain from Carrying on a Business, directly or through another under a Seller Party's supervision or control, which provides any Company Business within the Restricted Territory. The restrictions contained in this subsection (c) shall terminate upon the fifth anniversary of the Effective Date or, for Fritts, the later to occur of the fifth anniversary of the Effective Date or two years after his Cessation Date . The term "**Carrying on a Business**" shall mean to engage (including by way of solicitation of any Client or accepting any offer to provide Company Business to any Client) in any such Company Business (other than on behalf of Purchaser) as a sole proprietor, partner, member of a limited liability company, officer, director, employee, stockholder or similar capacity. It is expressly agreed that the foregoing is not intended to restrict or prohibit, and shall not restrict or prohibit, the ownership by such Seller Party of stock or other securities of a publicly-held corporation in which such Seller Party does not possess beneficial ownership of more than 5% of the voting stock of such corporation or participate in any consulting, management or advisory capacity.

(d)     No Seller Party will, directly or through another under such Seller Party's supervision or control, solicit, hire, employ, or otherwise retain the services of any active employee or independent contractor of Purchaser or any other Purchaser's Affiliates that was providing services to Purchaser or any of Purchaser's Affiliates during the six month period prior to the applicable Cessation Date, or otherwise induce any such employee or independent producer to terminate his relationship, or to breach an employment agreement, with such company. The restrictions contained in this subsection (d) shall terminate upon the fifth anniversary of the Effective Date or, for any Seller Principal employed by Purchaser or its Affiliate, the later to occur of the fifth anniversary of the Effective Date or two years after his or her Cessation Date.

(e)      No Seller Party will use, or grant to any Person the right to use at any time, any of the registered or unregistered trademarks and service marks (and any derivations thereof) used in providing Company Business (the "**Acquired Marks**"), or any similar names, juxtapositions or derivations thereof, without the prior written consent of Purchaser.  Promptly following the Closing Date, but in no event later than thirty (30) calendar days, the Seller Parties will change the name of Seller and any of its Affiliates to names that do not include any Acquired Marks or any name or mark similar thereto and make all necessary legal filings with the appropriate Governmental Entities to effect such change.  To the extent the Seller Parties or their Affiliates use any Acquired Marks or any derivation thereof on stationery, signage, invoices, receipts, forms, advertising and promotional materials, product, training and service literature and materials, computer programs, websites or on any other materials or in any other manner prior to or at the Closing, all such use shall cease and terminate at the Closing Date, except as required under the Transition Services Agreement or agreed upon by Purchaser.  Further, the Seller Parties shall execute any documentation requested by Purchaser to enable the transfer of all rights to the full use and enjoyment of the Acquired Marks.

(f)      At any time, Purchaser may, in its sole discretion, upon written notice signed by the Chief Executive Officer or Board of Managers of Purchaser to any of the Seller Parties, reduce, qualify or narrow (but not increase) the time period for which this Article 9, the Restricted Territory, or any other applicable restriction (including any defined term) to this Article 9 for such a Seller Party, as set forth in such written notice.  For the avoidance of doubt, no written notice shall be effective unless it is signed by the Chief Executive Officer or member of the Board of Managers of Purchaser and no other employee of Purchaser shall have authority to reduce, qualify or narrow the restrictions contained herein.

ARTICLE 10. AMENDMENT, MODIFICATION AND WAIVER

No amendment, modification or alteration of the terms or provisions of this Agreement shall be binding unless the same shall be in writing and duly executed by all Parties; provided, however, that any of the terms or provisions of this Agreement may be waived in writing at any time by the Party that is entitled to the benefits of such waived terms or provisions.  No waiver of any of the provisions of this Agreement shall be deemed to be, or shall constitute, a waiver of any other provision hereof (whether or not similar).  No delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

ARTICLE 11. ENTIRE AGREEMENT

This Agreement and all schedules and exhibits hereto, expresses the entire purchase agreement among the Parties with respect to the subject matter hereof and supersedes any prior agreements or understandings concerning such subject matter.

ARTICLE 12. THIRD-PARTY BENEFICIARIES

Subject to Article 19, this Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein expressed or implied shall give or be construed to give any Person, other than the Parties and such assigns, any legal or equitable rights hereunder.

ARTICLE 13. EXPENSES

-31-

All expenses incurred by each of the Parties in connection with or related to the authorization, preparation and execution of this Agreement and the closing of the transactions contemplated hereby, including, without limitation, all fees and expenses of agents, representatives, consultants, counsel and accountants employed by any such Party, shall be borne solely by the Party which has incurred such expense, other than all costs associated with the filings of a pre-merger notification and report forms by Purchaser and Fritts under the HSR Act, which shall be borne solely by Purchaser.

ARTICLE 14. <u>NOTICE</u>

All written notices, demands and requests of any kind which any Party may be required or may desire to serve upon any other Party in connection with this Agreement shall be in writing and shall be delivered only by (i) personal delivery; (ii) registered or certified mail, in each case, return receipt requested and postage prepaid; or (iii) nationally recognized overnight courier, with all fees prepaid (each, a "**Notice**").  All Notices shall be addressed to the Parties to be served as follows:

| | |
|---|---|
| If to any Seller Party or the Seller Representative: | Rice Insurance, L.L.C.<br>Attn: James Fritts<br>1400 Broadway<br>Bellingham, Washington 98225 |
| With required copies to (which shall not constitute Notice): | ACCEL Law Group P.C.<br>65 LaSalle Road, Suite 400<br>West Hartford, Connecticut 06107<br>Attention: Michael T. Griffin<br>Email: mgriffin@accelcompliance.com |
| If to Purchaser: | Peter C. Foy & Associates Insurance Services, LLC<br>Attn: Peter C. Foy<br>6200 Canoga Avenue, Suite 325<br>Woodland Hills, California 91367<br>Telephone: (818) 703-8057 |
| With required copies to (which shall not constitute Notice): | Midtown GC, PLLC<br>Attn: W. Wilhelm Rabke<br>3122 West Marshall Street, Suite 100<br>Richmond, Virginia 23230<br>Telephone: (804) 823-3944 |

Service of any such notice or demand so made shall be deemed complete on the day of actual delivery thereof as shown by the addressee's registry or certification receipt or other evidence of receipt, or refusal of delivery.  Any Party may from time to time by notice in writing served upon the other as aforesaid designate a different mailing address or a different or additional Person to which all such notices or demands hereafter are to be addressed.

-32-

ARTICLE 15. <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; WAIVER OF JURY TRIAL</u>

(a)    This Agreement shall be governed by, and construed under, the laws of the State of Washington, and all rights and remedies shall be governed by said laws, without regard to principles of conflicts of laws. To the fullest extent permitted by law, the Parties hereto agree that any claim, suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the other agreements or transactions contemplated hereby shall only be brought in the state courts in the State of Washington or the Federal courts in each case located in the State of Washington, and not in any other State or Federal courts located in the United States of America or any court in any other country, and each of the Parties hereby consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum. To the fullest extent permitted by law, process in any such suit, action or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of any such court.

(b)    EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

ARTICLE 16. <u>SEVERABILITY</u>

If any provision of this Agreement, whether a paragraph, sentence or a portion thereof, is determined by a court of competent jurisdiction to be null and void or unenforceable, such provision shall be deemed to be severed, and the remaining provisions of this Agreement shall remain in full force and effect.

ARTICLE 17. <u>PUBLIC ANNOUNCEMENTS</u>

No Seller Party shall make any public statements, including any press releases or any other public (or non-confidential) disclosure (whether or not in response to an inquiry), with respect to this Agreement and the transactions contemplated hereby without the prior written consent of Purchaser except as may be required by applicable law. If a public statement by any Seller Party is required to be made by applicable law, the Seller Parties shall use commercially reasonable efforts to consult with the Purchaser in advance as to the contents and timing thereof. Prior to issuing a press release or any other public statement, regarding the Closing of this Agreement, Purchaser shall consult with the Seller Representative in advance as to the contents and timing thereof.

-33-

ARTICLE 18. <u>HEADINGS</u>

All paragraph headings herein are inserted for convenience of reference only and shall not modify or affect the construction or interpretation of any provision of this Agreement.

ARTICLE 19. <u>SUCCESSORS AND ASSIGNS</u>

The terms and conditions of this Agreement shall inure to the benefit of and be binding upon each of the Parties hereto and their respective heirs, successors and permitted assigns, and the indemnification provisions of this Agreement shall also inure to the benefit of any Seller Indemnitees or Purchaser Indemnitees in accordance with the terms thereof. This Agreement may not be assigned by any Seller Party without the prior written consent of Purchaser.

ARTICLE 20. <u>REFORMATION</u>

Should any provision of this Agreement be held unenforceable or invalid under the laws of the United States of America or the State of Washington, or under any other applicable laws of any other jurisdiction, then the Parties agree that such provision shall be deemed reformed and modified for purposes of performance of this Agreement in such jurisdiction to the extent necessary to render it lawful and enforceable.

ARTICLE 21. <u>COUNTERPARTS</u>

This Agreement, and any amendment hereto, may be executed in two or more counterparts, each of which shall for all purposes be deemed to be an original and all of which shall constitute the same instrument. A facsimile or electronic copy (including a PDF file copy) of any such signed counterpart shall be treated and shall have the same force and effect as an originally signed counterpart.

ARTICLE 22. <u>BULK SALES LAW</u>

The Parties hereby waive compliance with any applicable Law with respect to the bulk sale of assets and Seller covenants and agrees to pay and discharge when due all claims of creditors which could be asserted against Purchaser by reason of such non-compliance.

ARTICLE 23. <u>SELLER REPRESENTATIVE</u>

(a)      By execution of this Agreement, each Seller Principal hereby appoints Fritts, and he hereby accepts the appointment, to act as the agent, representative, and attorney-in-fact for the Seller Principals for all purposes and with respect to all matters arising under this Agreement as the "Seller Representative." Any place in this Agreement where notice from or to, or consent by, any Seller Principal is required shall be satisfied by notice from or to, or consent by, the Seller Representative. The powers and authority of the Seller Representative will include, but not be limited to, the power and authority to give and accept notices as provided hereunder or under any other Transaction Documents; initiate, investigate, defend, compromise, arbitrate, settle, mediate, prosecute, and authorize payment of any and all indemnification claims pursuant to this Agreement; pay from the Purchase Price any and all indebtedness and transaction expenses and

-34-

any other fees and expenses incurred in connection with the transactions contemplated herein; and to otherwise carry out the purposes and intent of this Agreement.

(b)     Purchaser will be able to rely conclusively on the instructions, actions and decisions of the Seller Representative as to the initiation, investigation, defense, compromise, arbitration, settlement, mediation, prosecution, or payment of any indemnification claim pursuant to this Agreement, and any other actions required to be taken by any Seller Party or the Seller Representative under this Agreement. No Seller Party will have any cause of action against Purchaser for (i) any action taken by Purchaser in reliance upon the instructions, actions, or decisions of the Seller Representative or (ii) any failure by the Seller Representative to perform his obligations hereunder for any reason, whether deliberate, inadvertent, due to negligence or otherwise. Notices or communications to or from the Seller Representative will constitute notices or communications to or from Seller Parties for all purposes of this Agreement.

(c)     All actions, decisions, and instructions of the Seller Representative in connection with discharging his duties hereunder will be conclusive and binding on Seller Parties, and no Seller Party will have any cause of action against the Seller Representative for any action taken, decision made, payment made or instruction given, or omission to do any of the foregoing, by it under this Agreement, except for fraud in connection with, or willful breach of, this Agreement or the other Transaction Documents. The Seller Representative will be acting for the convenience of Seller Parties, without compensation, and, in such capacity, it will have no duties or liabilities beyond those expressly assumed by it in this Agreement. As the Seller Representative, the Seller Representative will not be required to make any inquiry or investigation concerning any matter other than those expressly contemplated hereunder, nor will it, in such capacity, be deemed to have made any representation or warranty of any kind to any Person. The Seller Representative will be entitled to rely on any communication or document that it believes to be genuine. Seller Parties, jointly and severally, shall indemnify and hold harmless the Seller Representative against any Adverse Consequences resulting from his role as the Seller Representative, except to the extent caused by or arising out of the Seller Representative's fraud or willful misconduct.

ARTICLE 24. <u>DEFINITIONS</u>

Capitalized terms not defined elsewhere herein shall have the following meanings ascribed to them below:

"**Acquired Assets**" means all those assets of Seller described below:

(a)     The list of Seller's Clients (all of which are listed on <u>Schedule 4.2(k)(i)</u> to this Agreement) and Active Prospective Clients, all of Seller's insurance expirations and all rights of renewal thereof and any other Client or renewal lists used in connection with providing Company Business, together with Seller's associated Goodwill, Confidential Information, files, claim files, books, records, ledgers, correspondence and other records, and advertising and promotional materials, studies and reports used in connection therewith (provided however that Seller may retain its tax records and minute books);

(b)     The sole right to collect and to retain (i) all insurance commissions collected on or after the Effective Date (including gross retained commissions realized from premiums collected on

-35-

and after the Effective Date) due Seller with respect to the Clients, irrespective of the attachment date or billing date of the insurance policies to which such commissions relate, provided, however, that direct bill policies shall be treated as set forth in subsection (c) below; (ii) all service fees due Seller for any services rendered in connection with the operation of the Acquired Assets and collected on and after the Effective Date by Seller; and (iii) all other commissions (including, but not limited to, profit sharing, override, contingent, supplemental or bonus type commissions), fees or other compensation paid, payable or due to Seller on or after the Effective Date in respect of the Acquired Assets irrespective of the date as of which such commissions, fees or other compensation was accrued or earned;

(c)    With respect to direct bill policies: (i) Seller shall own all commissions on such policies actually received by Seller from insurance carriers before the Effective Date; (ii) Purchaser shall own all such commissions actually received by insurance carriers on or after the Effective Date, regardless of when billed by the insurance carrier; and (iii) Purchaser shall have the sole right to collect and handle all return premiums or other payments due to Seller from insurance companies actually received on or after the Effective Date, and Seller shall promptly forward to Purchaser any such amounts received within three (3) business days of receipt;

(d)    The sole right to collect and retain all contingent commissions or similar compensation due to or received by Seller on and after the Effective Date in respect of the Acquired Assets from insurance underwriters in connection with contracts or other arrangements in effect on the Effective Date providing for such payments to Seller;

(e)    All of Seller's right, title and interest in and to the contracts and agreements listed and described in Schedule 1.1(e);

(f)    The property, real, personal and/or mixed, whether tangible or intangible, of Seller, listed on Schedule 1.1(f), including without limitation, (i) all inventory, office supplies and other inventories of or for Company Business (whether stored on or off-site) and (ii) all furniture, equipment and supplies used in connection with the Company Business, except to the extent identified as an Excluded Asset;

(g)    Seller's Goodwill and the Acquired Marks;

(h)    Seller's Intellectual Property and all of the rights of Seller in any Intellectual Property licensed by Seller, including without limitation the domain names set forth on Schedule 4.2(bb);

(i)    Except as otherwise required by law, all personnel records and files of Seller and Seller Principals or its Affiliates relating to the Company Business with respect to any employee of Seller hired by Purchaser or its Affiliates;

(j)    All originals, or where not available, copies, and electronic copies (if available) of all books and records relating to the Company Business;

(k)    All rights, to the extent assignable or transferable by law, to all permits, licenses, authorizations issued by a Governmental Entity relating to the Company Business, including those set forth on Schedule 1.1(k);

(l)      All rights and interests in and to Seller's bank accounts and to Seller's telephone numbers (other than personal cell phone numbers), domain name registrations and electronic mail addresses set forth on Schedule 1.1(l);

(m)      All rights, to the extent assignable or transferable by law, to the Insurance Premium Assets;

(n)      All rights, claims and causes of action under confidentiality, non-disclosure, non-compete, non-solicitation, non-piracy and other restrictive covenant agreements with Employees, former employees, Affiliates, former Affiliates, Seller Principals, and agents of Seller, in each case, that run in favor of such Seller Party, that are assumed by Purchaser, and relate to the Company Business; and

(o)      All rights, claims and causes of action of the Seller Parties against third parties to the extent arising from or related to the Acquired Assets or the Assumed Liabilities.

"**Active Prospective Client**" means, any Person, or a group of Persons, (i) who or which had been identified with reasonable particularity by any Seller Party (or any of its employee agents or Producers) in the business records of such Seller Party within the twelve (12) months preceding a specified date, with reasonable particularity as a possible client or customer of Seller; or (ii) to whom a Seller Party had communicated within the twelve (12) months preceding a specified date, in writing or otherwise as set forth in the business records of such Seller Party, with respect to the provision of any services that such Seller Party provides in the conduct of the Company Business.

"**Adverse Consequences**" means any damages, penalties, fines, costs, reasonable amounts paid in settlement, liabilities (including, without limitation, any liability which may arise under an alter ego, de facto control, de facto merger, successor, transferee or other similar theory or ground for liability), obligations, Taxes, liens, losses, diminution in value, expenses, fees and court costs and reasonable attorney's fees and expenses (but specifically excluding consequential, incidental, punitive, special or exemplary damages or damages for lost or expected profits except to the extent paid to third parties) incurred in connection with any action, suit, proceeding, hearing, investigation, charge, complaint, claim, demand, injunction, judgment, order, decree or ruling.

"**Affiliate**" means (a) with respect to any Person, any Person controlling, controlled by, or under common control with such Person (or an Affiliate of such Person), where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, by contract, or otherwise; and (b) if such Person is a partnership, any general partner thereof.

"**Assumed Liabilities**" means those obligations with respect to the Acquired Assets arising after the Effective Date and those liabilities specifically set forth on Schedule 1.3, including, without limitation, the Insurance Premium Liabilities.

"**Client**" means any Person (including, without limitation, any insured, or any insured to whom or which any sub-producer provides insurances services) to whom or which Seller (or any of its employees or independent contractors on behalf of Seller) have provided, at any time within the twenty-four (24) months preceding the Closing Date, any services that Seller provides in the conduct of Company Business. For purposes of this Agreement, "Client" shall include, without

limitation, any employer, employer group, affinity group, association, any individual insured, retail insurance agent or broker, and any insurance carrier or other entity to the extent third party administration claims processing or underwriting is performed by such Person for such carrier or other entity.

"**Client Accounts**" shall mean the business account between Seller and any Client of Seller, including, without limitation, any Person who or which is provided any Company Business by Seller as of the Closing Date, regardless of whether such services are provided by, or through the licenses of, Seller or any of its agents.

"**Closing EBITDA**" shall mean $15,876,000.

"**Company Business**" shall mean the business conducted by Seller, including, without limitation, quoting, placing, providing, servicing, and/or renewing Insurance Products or Services.

"**Confidential Information**" means any information of a Person, that is not already generally available to the public (unless such information has entered the public domain and become available to the public through fault on the part of the Party to be charged hereunder), including but not limited to: (i) the identity of any Client whose account constituted a Client Account at any time within the twenty-four (24) months preceding the Closing Date, as well as the identity of any Active Prospective Client as of such date; (ii) the identity, authority and responsibilities of key contacts at each such Client and Active Prospective Client; (iii) the service cost burden with respect to each such Client and Active Prospective Client; (iv) the identities of markets or companies from which insurance coverages or other commitments, benefits or services for clients are obtained; (v) the types of insurance coverages, and/or consulting, third-party administration, employee communication, investment management, managed care, human resource and other services provided or to be provided specifically to any such Client or Active Prospective Client, and the internal corporate policies relating thereto; (vi) the specific insurance policies purchased by or for such Clients or Active Prospective Clients; (vii) the expiration dates, commission rates, fees, premiums and other terms and conditions of such policies; (viii) the risk specifications and other characteristics, and claims loss histories of such Clients or Active Prospective Clients; (ix) the nature of programs and plans, including their design, funding and administration, demographic characteristics and any other information supplied by, or developed for, such Clients or Active Prospective Clients; (x) operations manuals, prospecting manuals and guidelines, pricing policies and related information, marketing manuals and plans, and business strategies, techniques and methodologies; (xi) financial information, including information set forth in internal records, files and ledgers, or incorporated in profit and loss statements, fiscal reports and business plans; (xii) technology and e-commerce strategies, business plans and implementations, inventions, algorithms, computer hardware, software and applications (including but not limited to any source code, object code, documentation, diagrams, flow charts, know-how, methods or techniques, associated with the development or use of the foregoing computer software); (xiii) all internal memoranda and other office records, including electronic and data processing files and records; and (xiv) any other information constituting a trade secret under the governing trade secrets law.

"**EBITDA**" means, for any period, related solely to the Acquired Assets, Net Income for such period (without giving effect to (v) any Net Income arising from life insurance commissions

exceeding $126,832, (w) any extraordinary gains or losses, (x) any non-cash income or non-cash expenses arising from stock option compensation, restructuring charges and asset impairment charges, (y) any gains or losses from sales of assets and (z) the effects of purchase accounting) adjusted by adding thereto (in each case to the extent deducted in determining Net Income for such period), without duplication, the amount of (i) total interest expense (inclusive of amortization of deferred financing fees and other original issue discount and banking fees, charges and commissions (e.g., letter of credit fees and commitment fees) and any portion of capitalized leases treated as interest) of the Acquired Assets determined on consolidated and combined basis for such period, (ii) provision for taxes based on income attributed to the Acquired Assets determined on a consolidated and combined basis for such period, or (iii) all depreciation and amortization expense attributed to the Acquired Assets determined on a consolidated and combined basis for such period, and subtracting those operational costs and operating expenses that were incurred and also which would have been incurred in the Ordinary Course of Business by Seller, were it not for the acquisition contemplated by this Agreement.  All calculations of EBITDA made pursuant to this Agreement shall be made without proforma adjustments or add-backs.

"**Environmental, Health, and Safety Laws**" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, the Resource Conservation and Recovery Act of 1976, and the Occupational Safety and Health Act of 1970, each as amended, together with all other applicable legal requirements (including rules, regulations, codes, plans, injunctions, judgments, orders, decrees, rulings, and charges thereunder) of federal, state, local, and foreign governments (and all agencies thereof) concerning pollution or protection of the environment, public health and safety, or employee health and safety, including applicable legal requirements relating to emissions, discharges, releases, or threatened releases of pollutants, contaminants, or chemical, industrial, hazardous, or toxic materials or wastes into ambient air, surface water, ground water, or lands or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport, or handling of pollutants, contaminants, or chemical, industrial, hazardous, or toxic materials or wastes.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**FLSA**" means collectively, (a) the federal Fair Labor Standards Act, as amended, or any successor statute, (b) any equivalent state or local law, and (c) and any rules or regulations promulgated thereunder.

"**Goodwill**" means the goodwill of Seller associated with existing Clients.

"**Governmental Entity**" means any government or any agency, bureau, board, commission, court, department, official, political subdivision, tribunal, arbitral body, or other instrumentality of any government, whether federal, state or local, or any arbitrational or mediational tribunal.

"**Insurance Premium Assets**" means all of Seller's cash and collections, each as solely related to insurance premiums' account receivables, less commissions included in such amounts, all determined in accordance with Seller's past practices consistently applied.

"**Insurance Premium Liability**" means all of Seller's accounts payable solely related to insurance premiums for which cash has been received by Seller as part of the Insurance Premium Assets, all determined in accordance with Seller's past practice consistently applied.

"**Insurance Products or Services**" means (a) Employee Benefits Products or Services, (b) Insurance-Related Services, and/or (c) P&C Products or Services, as such terms are defined below:

(a)    "Employee Benefits Products or Services" means (i) employer-sponsored benefits accounts with programs, whether self-insured or fully insured, such as group life, group health, group dental, group disability, group long-term care, and ancillary benefits sold to groups, and (ii) insurance procured for individual, natural persons (e.g., life, health, annuities, long-term care, and similar or related products and services).

(b)    "Insurance-Related Services" means any services provided to a Client, either directly or by a third-party service provider, whether or not for a fee and whether or not pursuant to a written contract, including but not limited to: third-party administration (TPA); risk management; loss control; compliance or other consulting services; claims analysis; insurance program administration; enrollment services; COBRA, Section 125 Cafeteria Plan, Health Savings Account (HSA) Plan, Health Reimbursement Arrangement (HRA) Plan, Health Flexible Spending Account (FSA) Plan, and/or Premium Reimbursement Arrangement (PRA) Plan administration; preparation, review, and/or filing of IRS Form 5500s; referrals to on-site medical clinics, attorneys, or other third-party service providers (whether or not a referral fee or other remuneration is paid by such providers for such referrals); or other services.

(c)    "P&C Products or Services" means (i) commercial lines or personal lines property and casualty insurance products, and/or (ii) commercial or individual bond or suretyship products.

"**Intellectual Property**" means all of the following in any jurisdiction throughout the world: (a) inventions (whether or not patentable or reduced to practice), patents, patent applications, and patent disclosures, together with all reissues, continuations, continuations-in-part, revisions, divisionals, extensions, reexaminations and counterparts in connection therewith; (b) trademarks, service marks, trade dress, logos, slogans, trade names, trade dress, corporate names and Internet domain names and all other indicia of origin (and all translations, adaptations, derivations, and combinations of any of the foregoing), together with all Goodwill associated with each of the foregoing; (c) copyrights (including "look and feel"), other works of authorship, mask works and moral rights; (d) issuances, registrations, applications, and renewals for any of the foregoing; (e) confidential business information, know-how and trade secrets; (f) software (including object code, source code, tools, applications, systems, databases, data and related documentation) and database rights; (g) all rights of privacy and publicity, including rights to use of the names, likenesses, voices, signatures and biographical information of real Persons; (h) all other intellectual property and proprietary rights; and (i) all tangible embodiments of the foregoing (in whatever form or medium).

"**Knowledge**" means, with respect to any Person, (i) the actual knowledge of such Person (including the actual knowledge of the officers, directors and key employees of such Person); and (ii) that knowledge which could have been acquired by such Person after making reasonable

inquiry and exercising such due diligence as a reasonably prudent businessperson would have made or exercised in the management of his, her or its business affairs, which may include inquiry of those officers, directors, employees, agents and representatives of such Person who could reasonably be expected to have knowledge of the matters in question.

"**Law**" shall mean any federal, state, local or municipal law, statute, ordinance, regulation, code, order, judgment, decree, rule, constitution, treaty, notice requirement, agency guideline, or other requirement or rule of law of any Governmental Entity.

"**Net Income**" means, for any period, the net income (or loss) of the Acquired Assets determined on a consolidated and combined basis for such period (taken as a single accounting period) in accordance with past custom and practice of Seller.

"**Net Working Capital**" means the amount of working capital calculated in accordance with Schedule 2.3, which amount shall include (i) the Insurance Premium Assets and other current assets that are part of the Acquired Assets, including any cash and accounts receivable, and (ii) the Insurance Premium Liabilities and all accounts payable and other accrued current liabilities of Seller, relating to the Acquired Assets which will be prepared in accordance with Section 2.3 hereof.

"**Ordinary Course of Business**" means the ordinary course of business consistent with past custom and practice (including with respect to quantity and frequency), but in no event shall such term include any professional error or omission, or any act or event creating a severance obligation, wrongful discharge claim or similar liability.

"**Person**" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, a limited liability company, limited liability partnership, or a Governmental Entity.

"**PTO Liabilities**" means the aggregate amount of any liabilities accrued by Seller for any obligations that Seller may have to provide paid time off to its employees. If such obligations are tracked by hours or workdays, rather than dollars, dollar amounts will be calculated to zero out such hours or workday tracking to cause no employees of Seller to have any rights to claim paid time off, as of Effective Date.

"**Restricted Territory**" means those counties or similar geographic territories where any Seller Party conducted Company Business as of the Closing Date.

"**Restrictive Covenants**" means the covenants of the Seller Parties contained in Article 9 hereof.

"**Security Interest**" means any mortgage, pledge, lien, encumbrance, charge, or other security interest of any nature whatsoever, other than: (i) liens for Taxes or governmental assessments, charges or claims, the payment of which is not yet due; and (ii) statutory liens of landlords, warehousemen, mechanics, materialmen and other similar Persons incurred in the Ordinary Course of Business for sums not yet delinquent.

"**Tax**" means any Federal, state, local or foreign income, gross receipts, payroll, employment, excise, premium, franchise, withholding, social security (or similar tax), unemployment, real property, personal property, sales, use, transfer, alternative or add-on minimum (including taxes under Code Sec. 59A), profits, estimated or other tax of any kind whatsoever, including any liability therefore as a transferee or successor under applicable Law or by contract, or as a result of any Tax sharing or similar agreement, together with any interest, penalty or addition thereto, whether disputed or not.

"**Tax Return**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Transaction Documents**" means this Agreement and all other agreements, instruments, certificates and other documents to be entered into or delivered by any Party, pursuant to any of the foregoing.

[SIGNATURE PAGE FOLLOWS]

-42-

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**SELLER:**

Rice Insurance, L.L.C.

By: _James G. Fritts_____
Name: James Fritts
Title: Manager

**SELLER REPRESENTATIVE:**

_James G. Fritts_____
James Fritts, as an individual

**PURCHASER:**

PCF Insurance Services of the West, LLC

By: _____
Name: Peter C. Foy
Title: Chief Executive Officer

**SELLER PRINCIPALS:**

_James G. Fritts_____
James Fritts, as an individual

_____
Troy Haskell, as an individual

_____
Brett Nebeker, as an individual

_____
Joe Tejeda, as an individual

_____
Shane Vandergiessen, as an individual

_____
Tim Welch, as an individual

_____
Derek Dickerson, as an individual

_____
Amelia Mendenhall, as an individual

_____
Adam Dickson, as an individual

_____
Sandie Mathewson, as an individual

[*Signature Page to Asset Purchase Agreement*]

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**SELLER:**                                      **SELLER PRINCIPALS:**

Rice Insurance, L.L.C.

_____
James Fritts, as an individual

By:    _____
Name: _____
Title: _____

_____
Troy Haskell, as an individual

**SELLER REPRESENTATIVE:**

_____
Brett Nebeker, as an individual

_____
James Fritts, as an individual

_____
Joe Tejeda, as an individual

**PURCHASER:**

PCF Insurance Services of the West, LLC

_____
Shane Vandergiessen, as an individual

By: _____
Name: Peter C. Foy
Title:  Chief Executive Officer

_____
Tim Welch, as an individual

_____
Derek Dickerson, as an individual

_____
Amelia Mendenhall, as an individual

_____
Adam Dickson, as an individual

_____
Sandie Mathewson, as an individual

*[Signature Page to Asset Purchase Agreement]*

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**SELLER:**

Rice Insurance, L.L.C.

By: _____
Name: James Fritts
Title: Manager

**SELLER REPRESENTATIVE:**

_____
James Fritts, as an individual

**PURCHASER:**

PCF Insurance Services of the West, LLC

By: _____
Name: Peter C. Foy
Title: Chief Executive Officer

**SELLER PRINCIPALS:**

_____
James Fritts, as an individual

_____
Troy Haskell, as an individual

_____
Brett Nebeker, as an individual

_____
Joe Tejeda, as an individual

_____
Shane Vandergiessen, as an individual

_____
Tim Welch, as an individual

_____
Derek Dickerson, as an individual

_____
Amelia Mendenhall, as an individual

_____
Adam Dickson, as an individual

_____
Sandie Mathewson, as an individual

*[Signature Page to Asset Purchase Agreement]*

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**SELLER:**

Rice Insurance, L.L.C.

By: _____
Name: James Fritts
Title: Manager

**SELLER REPRESENTATIVE:**

_____
James Fritts, as an individual

**PURCHASER:**

PCF Insurance Services of the West, LLC

By: _____
Name: Peter C. Foy
Title: Chief Executive Officer

**SELLER PRINCIPALS:**

_____
James Fritts, as an individual

_____
Troy Haskell, as an individual

_Brett D. Nebeker_
_____
Brett Nebeker, as an individual

_____
Joe Tejeda, as an individual

_____
Shane Vandergiessen, as an individual

_____
Tim Welch, as an individual

_____
Derek Dickerson, as an individual

_____
Amelia Mendenhall, as an individual

_____
Adam Dickson, as an individual

_____
Sandie Mathewson, as an individual

[*Signature Page to Asset Purchase Agreement*]

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**SELLER:**

Rice Insurance, L.L.C.

By: _____
Name: James Fritts
Title: Manager

**SELLER REPRESENTATIVE:**

_____
James Fritts, as an individual

**PURCHASER:**

PCF Insurance Services of the West, LLC

By: _____
Name: Peter C. Foy
Title: Chief Executive Officer

**SELLER PRINCIPALS:**

_____
James Fritts, as an individual

_____
Troy Haskell, as an individual

_____
Brett Nebeker, as an individual

_Joseph D. Tejeda_
_____
Joe Tejeda, as an individual

_____
Shane Vandergiessen, as an individual

_____
Tim Welch, as an individual

_____
Derek Dickerson, as an individual

_____
Amelia Mendenhall, as an individual

_____
Adam Dickson, as an individual

_____
Sandie Mathewson, as an individual

[*Signature Page to Asset Purchase Agreement*]

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**SELLER:**

Rice Insurance, L.L.C.

By: _____
Name: James Fritts
Title: Manager

**SELLER REPRESENTATIVE:**

_____
James Fritts, as an individual

**PURCHASER:**

PCF Insurance Services of the West, LLC

By: _____
Name: Peter C. Foy
Title: Chief Executive Officer

**SELLER PRINCIPALS:**

_____
James Fritts, as an individual

_____
Troy Haskell, as an individual

_____
Brett Nebeker, as an individual

_____
Joe Tejeda, as an individual

_____
Shane Vandergiessen, as an individual

_____
Tim Welch, as an individual

_____
Derek Dickerson, as an individual

_____
Amelia Mendenhall, as an individual

_____
Adam Dickson, as an individual

_____
Sandie Mathewson, as an individual

[*Signature Page to Asset Purchase Agreement*]

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**SELLER:**                                    **SELLER PRINCIPALS:**

Rice Insurance, L.L.C.

_____
James Fritts, as an individual

By: _____
Name: James Fritts                             _____
Title: Manager                                 Troy Haskell, as an individual

**SELLER REPRESENTATIVE:**
                                               _____
                                               Brett Nebeker, as an individual

_____
James Fritts, as an individual                 _____
                                               Joe Tejeda, as an individual

**PURCHASER:**

PCF Insurance Services of the West, LLC         _____
                                               Shane Vandergiessen, as an individual

                                               *Timothy Welch*
By: _____                    _____
Name: Peter C. Foy                             Tim Welch, as an individual
Title: Chief Executive Officer

                                               _____
                                               Derek Dickerson, as an individual

                                               _____
                                               Amelia Mendenhall, as an individual

                                               _____
                                               Adam Dickson, as an individual

                                               _____
                                               Sandie Mathewson, as an individual

[*Signature Page to Asset Purchase Agreement*]

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**SELLER:**                                    **SELLER PRINCIPALS:**

Rice Insurance, L.L.C.

_____
James Fritts, as an individual

By:    _____
Name:    James Fritts                          _____
Title:    Manager                              Troy Haskell, as an individual

**SELLER REPRESENTATIVE:**
                                               _____
                                               Brett Nebeker, as an individual

_____
James Fritts, as an individual                 _____
                                               Joe Tejeda, as an individual

**PURCHASER:**
                                               _____
PCF Insurance Services of the West, LLC        Shane Vandergiessen, as an individual

By:    _____              _____
Name:    Peter C. Foy                          Tim Welch, as an individual
Title:    Chief Executive Officer
                                               *Derek D. Dickerson*
                                               _____
                                               Derek Dickerson, as an individual

                                               _____
                                               Amelia Mendenhall, as an individual

                                               _____
                                               Adam Dickson, as an individual

                                               _____
                                               Sandie Mathewson, as an individual

[*Signature Page to Asset Purchase Agreement*]

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**SELLER:**

Rice Insurance, L.L.C.

By: _____
Name: James Fritts
Title: Manager

**SELLER REPRESENTATIVE:**

_____
James Fritts, as an individual

**PURCHASER:**

PCF Insurance Services of the West, LLC

By: _____
Name: Peter C. Foy
Title: Chief Executive Officer

**SELLER PRINCIPALS:**

_____
James Fritts, as an individual

_____
Troy Haskell, as an individual

_____
Brett Nebeker, as an individual

_____
Joe Tejeda, as an individual

_____
Shane Vandergiessen, as an individual

_____
Tim Welch, as an individual

_____
Derek Dickerson, as an individual

*Amelia J. Mendenhall*
_____
Amelia Mendenhall, as an individual

_____
Adam Dickson, as an individual

_____
Sandie Mathewson, as an individual

[*Signature Page to Asset Purchase Agreement*]

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**SELLER:**

Rice Insurance, L.L.C.

By: _____
Name: James Fritts
Title: Manager

**SELLER REPRESENTATIVE:**

_____
James Fritts, as an individual

**PURCHASER:**

PCF Insurance Services of the West, LLC

By: _____
Name: Peter C. Foy
Title: Chief Executive Officer

**SELLER PRINCIPALS:**

_____
James Fritts, as an individual

_____
Troy Haskell, as an individual

_____
Brett Nebeker, as an individual

_____
Joe Tejeda, as an individual

_____
Shane Vandergiessen, as an individual

_____
Tim Welch, as an individual

_____
Derek Dickerson, as an individual

_____
Amelia Mendenhall, as an individual

*Adam Dickson*
_____
Adam Dickson, as an individual

_____
Sandie Mathewson, as an individual

*[Signature Page to Asset Purchase Agreement]*

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**SELLER:**

Rice Insurance, L.L.C.

By: _____
Name: _James Fritts_
Title: _Manager_

**SELLER REPRESENTATIVE:**

_____
James Fritts, as an individual

**PURCHASER:**

PCF Insurance Services of the West, LLC

By: _____
Name: Peter C. Foy
Title: Chief Executive Officer

**SELLER PRINCIPALS:**

_____
James Fritts, as an individual

_____
Troy Haskell, as an individual

_____
Brett Nebeker, as an individual

_____
Joe Tejeda, as an individual

_____
Shane Vandergiessen, as an individual

_____
Tim Welch, as an individual

_____
Derek Dickerson, as an individual

_____
Amelia Mendenhall, as an individual

_____
Adam Dickson, as an individual

_Sandra R. Mathewson_
_____
Sandie Mathewson, as an individual

[*Signature Page to Asset Purchase Agreement*]

**EXHIBIT A**

PURCHASE PRICE ALLOCATION

The Purchase Price shall be allocated as follows:

|  |  |  | *Tax Allocation* |
|---|---|---|---|
| Class I | Cash | To be determined post-Closing by Purchaser and the Seller Representative. | |
| Class III | Accounts Receivables | To be determined post-Closing by Purchaser and the Seller Representative. | |
| Class V | Furniture, Fixtures & Equipment | To be determined post-Closing by Purchaser and the Seller Representative. | |
| Class V | Prepaid & Other Miscellaneous Assets | To be determined post-Closing by Purchaser and the Seller Representative. | |
| Class VI | Covenants not to Compete | 0.5% of Cash Consideration. | |
| Class VII | Goodwill | Remainder of Purchase Price to be allocated to Goodwill of Seller. | |
| *Total* | | | |

**SCHEDULE 2.1(c)**
**Earn-Out Calculation**

| EBITDA Band | Earn-Out Factor |
|---|---|
| Portion of EBITDA between 103% and 110% of the Baseline Metric | Seven Times (7x) |
| Portion of EBITDA greater than 110.0% and up to 115% of the Baseline Metric | Eight Times (8x) |
| Portion of EBITDA greater than 115.0% and up to 120% of the Baseline Metric | Nine Times (9x) |
| Portion of EBITDA greater than 120% of Baseline Metric | Ten Times (10x) |

For purposes hereof:

The "**Baseline Metric**" means either (x) if the Earn-Out Payment for the prior Earn-Out Period was earned, then One Hundred Three Percent (103%) of the prior Earn-Out Period's EBITDA; or (y) if the Earn-Out Payment for the prior Earn-Out Period was not earned, then the sum of (i) Closing EBITDA plus (i) (A) Closing EBITDA times (B) (a) three percent (3%) times (b) the number of the years since Closing.

An "**Earn-Out Component**" means the product of (x) that portion of the applicable EBITDA for the respective Earn-Out Period falling within the EBITDA Band times (y) the applicable Earn-Out Factor.

A "**Sum of Earn-Out Components**" means the sum of all Earn-Out Components calculated as positive amounts for a specific Earn-Out Period.

# EXHIBIT B

## TRANSITION SERVICES AGREEMENT

This Transition Services Agreement, dated as of July 15, 2021 (the "*Agreement*"), is entered into between Rice Insurance, L.L.C., a Washington limited liability company ("*Seller*"), and PCF Insurance Services of the West, LLC, a Delaware limited liability company ("*Purchaser*"). Purchaser and Seller are referred to herein individually as a "*Party*", and collectively as the "*Parties*".  Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to such terms in the Purchase Agreement (as defined below).

## RECITALS:

WHEREAS, Purchaser, Seller, and the Seller Principals, as named therein, have entered into that certain Asset Purchase Agreement, dated of even date herewith (the "*Purchase Agreement*"), pursuant to which Seller has agreed to sell and assign to Purchaser, and Purchaser has agreed to purchase and assume from Seller, substantially all the assets, and certain specified liabilities of the Company Business, all as more fully described therein; and

WHEREAS, in order to ensure an orderly transition of the Company Business to Purchaser and as an express condition to consummating the transactions contemplated by the Purchase Agreement, the Parties have agreed to enter into this Agreement, pursuant to which Seller will provide Purchaser with certain services, in each case on a transitional basis and subject to the terms and conditions set forth herein.

## AGREEMENT:

NOW, THEREFORE, in consideration of the mutual agreements and covenants hereinafter set forth, the Parties hereby agree as follows:

## ARTICLE I
### SERVICES

**Section 1.01    Provision of Services.**

(a)        Seller agrees to provide, commencing on the Closing Date, the services (the "*Services*") set forth on the exhibit attached hereto (as such exhibit may be amended or supplemented pursuant to the terms of this Agreement, the "*Services Exhibit*") to Purchaser for the respective periods and on the other terms and conditions set forth in this Agreement and in the Services Exhibit.

(b)        Notwithstanding the content of the Services Exhibit, Purchaser may request that Seller provide additional services that are reasonably necessary for the operation of the Company Business and which are not currently contemplated in the Services Exhibit (each, an "*Additional Service*").  Seller shall review and respond to such request for Additional Services in good faith; provided, that notwithstanding the foregoing, Seller has the right, in its sole discretion, to reject any such request for Additional Services.  Any such Additional Services so provided by Seller shall constitute "Services" under this Agreement and be subject in all respect to the provisions of this Agreement as if fully set forth on the Services Exhibit as of the date hereof.

(c)    The obligations of Seller under this Agreement to provide Services shall terminate with respect to each Service on the respective End Date specified in the Services Exhibit. Notwithstanding the foregoing, the Parties acknowledge and agree that Purchaser may determine from time to time that it does not require all the Services set out on the Services Exhibit or that it does not require such Services for the entire period up to the applicable End Date. Accordingly, Purchaser may terminate any Service, in whole or in part, upon written notification to Seller.

(d)    Seller does not have any duty or obligation to use or expend its own funds in the performance of the Services and Purchaser acknowledges that Services may be provided by Transferred Employees who are employees of Purchaser at the time the Services are provided.

(e)    Seller shall be added as an insured on all relevant insurance policies of Purchaser for so long as Seller is rendering the Services to Purchaser.

**Section 1.02   Standard of Service.**  The Services shall be provided in good faith, in accordance with applicable law and in a manner generally consistent with the historical provision of the Services in the operation of the Company Business and with the same standard of care as historically provided.  Purchaser agrees to make the Transferred Employees that provide the Services available to Seller as reasonably required by Seller in order to provide the Services in the manner as described herein.

**Section 1.03   Limitations on Damages.**  NO PARTY NOR ANY OF ITS AFFILIATES SHALL BE LIABLE, WHETHER IN CONTRACT, IN TORT OR OTHERWISE, FOR ANY SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES WHATSOEVER, WHICH IN ANY WAY ARISE OUT OF, RELATE TO, OR ARE A CONSEQUENCE OF, ITS OR ANY OF ITS AFFILIATES' OR A THIRD PARTY'S PERFORMANCE OR NONPERFORMANCE HEREUNDER, OR THE PROVISION OF OR FAILURE TO PROVIDE ANY OF THE SERVICES HEREUNDER, INCLUDING LOSS OF PROFITS OR DATA, BUSINESS INTERRUPTIONS AND CLAIMS OF THIRD PARTIES OR EMPLOYEES OF PURCHASER OR SELLER.

**Section 1.04   Indemnification.**  Each Party hereby releases the other Parties and each of their affiliates and each of their respective officers, directors, employees, stockholders, members, third party service providers, agents and representatives (the "_Indemnified Parties_"), and agrees to indemnify and hold harmless the Indemnified Parties, from and against any and all claims, losses, damages, liabilities, obligations or expenses, including third-party legal fees and expenses (collectively, "_Losses_"), to the extent arising or resulting from third party claims arising or resulting from the indemnifying Party's or its subsidiaries' gross negligence or willful misconduct in the performance or receipt of the Services hereunder, except to the extent that such Losses are due to such Indemnified Party's breach of this Agreement, violation of applicable law, negligence, recklessness or willful misconduct (including willful and intentional breach of its obligations as expressly set forth in this Agreement).

**Section 1.05   Third-Party Service Providers.** Subject to Purchaser's obligation to make Transferred Employees available to Seller in order to perform the Services as set forth in Section 1.02, Seller shall not, without Purchaser's prior written consent, hire previously unaffiliated third-party subcontractors to provide all or part of any Service hereunder.  In the event Purchaser

2

provides such consent, Seller shall in all cases retain responsibility for the provision to Purchaser of Services to be performed by any third-party service provider or subcontractor.  To the extent Seller reasonably determines that such Transferred Employees have not been made available to Seller, no consent under this Section 1.05 shall apply and Seller may retain any third-party service provider or subcontractor as it determines necessary to provide the Services.

Section 1.06   **Independent Contractor.**  At all times during the term of this Agreement, Seller shall be an independent contractor in providing the Services hereunder.  Nothing contained in this Agreement shall be deemed or construed to create a partnership or joint venture, to create the relationships of employee/employer or principal/agent, or otherwise create any liability whatsoever of any party with respect to the indebtedness, liabilities, obligations or actions of the other parties or any of their respective officers, directors, employees, stockholders, agents or representatives, or any other person or entity.

## ARTICLE II
### TERMINATION

**Section 2.01   Termination of Agreement.** Subject to **Section 2.03**, this Agreement shall terminate in its entirety on the date upon which Seller shall have no continuing obligation to perform, or cause to be performed, any Services as a result of each of their expiration or termination in accordance with **Section 1.01(c)** or **Section 2.02**.

**Section 2.02   Breach.** Any Party (the "*Non-Breaching Party*") may terminate this Agreement with respect to any Service, in whole or in part, at any time upon prior written notice to the Party to or by whom such Service is being provided, as applicable (the "*Breaching Party*"), if the Breaching Party has failed to perform any of its material obligations under this Agreement relating to such Service, and such failure shall have continued without cure for a period of ten (10) calendar days after receipt by the Breaching Party of a written notice of such failure, stating in reasonable detail the alleged grounds for the assertion of the breach or breaches, from the Non-Breaching Party seeking to terminate such service.

**Section 2.03   Effect of Termination.** Upon termination of this Agreement in its entirety pursuant to **Section 2.01**, all obligations of the Parties hereto shall terminate, except for the provisions of **Section 1.01(c)**, **Article III**, **Article IV** and the obligation of Purchaser to make payments for and regarding the Services performed through the date of termination or expiration, which obligation shall survive any termination or expiration of this Agreement.

## ARTICLE III
### CONFIDENTIALITY

**Section 3.01   Proprietary Materials.**  If any Party or any of its affiliates furnishes to another Party any Proprietary Materials pursuant to this Agreement, the disclosing Party, as the case may be, shall retain exclusive ownership therein.  As used herein, "*Proprietary Materials*" means all information, intellectual property, data and knowledge furnished or made available by

3

the disclosing Party or its affiliates to another Party as part of the Services, or used in the performance of Services hereunder, and copies thereof, including software, documentation, techniques, tools, templates, processes, procedures, discoveries, and marketing and business planning concepts or plans. No Party will gain, by virtue of this Agreement or the Services hereunder, by implication or otherwise, any rights of ownership of any property, Proprietary Materials or intellectual property owned by another Party.

**Section 3.02   Confidentiality.** Each Party acknowledges that the information provided to it in connection with the Services (including, if applicable, any Proprietary Material) is subject to the terms of the Purchase Agreement, the terms of which are incorporated herein by reference.

**ARTICLE IV**
**MISCELLANEOUS**

**Section 4.01   Notices.** All written notices, demands and requests of any kind which any Party may be required or may desire to serve upon any other Party in connection with this Agreement shall be in writing and shall be delivered only by (i) personal delivery; (ii) registered or certified mail, in each case, return receipt requested and postage prepaid; or (iii) nationally recognized overnight courier, with all fees prepaid (each, a "*Notice*"). All Notices shall be addressed to the Parties to be served as follows:

If to any Seller Party:

> Rice Insurance, L.L.C.
> Attn: James Fritts
> 1400 Broadway
> Bellingham, Washington 98225

With required copies to (which shall not constitute Notice):

> ACCEL Law Group
> Attn:  Michael T. Griffin
> 65 LaSalle Road, Suite 400
> West Hartford, CT 06107
> Telephone: (860) 761-8550

If to Purchaser:

> Peter C. Foy & Associates Insurance Services, LLC
> Attn: Peter C. Foy
> 6200 Canoga Avenue, Suite 325
> Woodland Hills, California 91367
> Telephone: (818) 703-8057

With required copies to (which shall not constitute Notice):

> Midtown GC, PLLC
> Attn: W. Wilhelm Rabke
> 3122 West Marshall Street, Suite 100
> Richmond, Virginia 23230

4

Telephone: (804) 823-3944

Service of any such notice or demand so made shall be deemed complete on the day of actual delivery thereof as shown by the addressee's registry or certification receipt or other evidence of receipt, or refusal of delivery.  Any Party may from time to time by notice in writing served upon the other as aforesaid designate a different mailing address or a different or additional person to which all such notices or demands hereafter are to be addressed.

**Section 4.02   Headings.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 4.03   Severability.** If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**Section 4.04   Entire Agreement.** This Agreement, including the Services Exhibit, constitutes the sole and entire agreement of the Parties to this Agreement with respect to the subject matter contained herein and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.  In the event and to the extent that there is a conflict between the provisions of this Agreement and the provisions of the Purchase Agreement solely as it relates to the Services hereunder, the provisions of this Agreement shall control.

**Section 4.05   Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and permitted assigns. Subject to the following sentence, no Party may assign its rights or obligations hereunder without the prior written consent of the other Party. Notwithstanding the foregoing sentence, Purchaser may, without the consent of Seller, assign all or any portion of its right to receive Services to any of its Affiliates that participate in the operation of the Company Business.

**Section 4.06   No Third-Party Beneficiaries.** This Agreement is for the sole benefit of the Parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever, under or by reason of this Agreement.

**Section 4.07   Amendment and Modification; Waiver.** This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each Party hereto. No waiver by any Party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the Party so waiving. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder

5

preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

Section 4.08    **Governing Law; Submission to Jurisdiction.** This Agreement shall be governed by, and construed under, the laws of the State of Washington, and all rights and remedies shall be governed by said laws, without regard to principles of conflicts of laws.  To the fullest extent permitted by law, the Parties hereto agree that any claim, suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the other agreements or transactions contemplated hereby shall only be brought in the state courts in the State of Washington or the Federal courts located in the State of Washington, in cases sitting in the State of Washington, and not in any other State or Federal courts located in the United States of America or any court in any other country, and each of the Parties hereby consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum.  To the fullest extent permitted by law, process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court.

Section 4.09    **Waiver of Jury Trial.** Each Party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby. Each Party to this agreement certifies and acknowledges that (a) no representative of any other Party has represented, expressly or otherwise, that such other Party would not seek to enforce the foregoing waiver in the event of a legal action, (b) such Party has considered the implications of this waiver, (c) such party makes this waiver voluntarily, and (d) such Party has been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 4.09.

Section 4.10    **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Signature page follows]*

6

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**SELLER:**

Rice Insurance, L.L.C.

By: *James G. Fritts*
Name:  James Fritts
Title:   Manager

**PURCHASER:**

PCF Insurance Services of the West, LLC

By: _____
Name:  Peter C. Foy
Title:   Chief Executive Officer

[*Signature Page to Transition Services Agreement*]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**SELLER:**

Rice Insurance, L.L.C.

By: _____
Name: _____
Title: _____

**PURCHASER:**

PCF Insurance Services of the West, LLC

By: _____
Name:  Peter C. Foy
Title:   Chief Executive Officer

[*Signature Page to Transition Services Agreement*]

**SERVICES EXHIBIT**

**I.      Interim Operation of the Company Business; Transition of Operations**

<u>Description of Services</u>:   For the economic benefit of Purchaser, (i) retain possession and control of, and have the right to use at no charge, the Acquired Assets that have not been transferred to Purchaser as of the Closing; (ii) operate that portion of the Company Business that has not been transferred to Purchaser as of the Closing in the ordinary course of business consistent with past practice, and pursuant to the other terms and conditions set forth in the Asset Purchase Agreement; and (iii) transition control and possession of the Acquired Assets and operation of the Company Business to Purchaser.

<u>Fee</u>:  Purchaser shall be responsible for the payment when due of all fees, costs and expenses related to the above Services.

<u>End Date</u>:  The date on which Purchaser determines, in its good faith reasonable judgment, that such services set forth in this Item I of the Services Exhibit are no longer required, but in no event shall such end date occur later than two (2) years from the effective date hereof.

**II.      Contract, Carrier and Customer Transition**

<u>Description of Services</u>:  Support carrier and customer transition to Purchaser. Facilitate communications with carriers and customers related to the transition.

<u>Fee</u>:  Purchaser shall be responsible for the payment when due of all fees, costs and expenses related to the above Services.

<u>End Date</u>: The date on which Purchaser determines, in its good faith reasonable judgment, that such services set forth in this Item II of the Services Exhibit are no longer required, but in no event shall such end date occur later than two (2) years from the effective date hereof.

**III.      Collection and Payment Services**

<u>Description of Services</u>: Promptly remit any net amounts resulting from Operation of the Company Business that Seller receives from third parties in connection with Company Business that has not been transferred to Purchaser as of the Closing but that are owed to Purchaser following the Closing (to the extent the same do not consist of Excluded Assets) to Purchaser on a monthly basis within fifteen (15) days of the end of each calendar month.

<u>Fee</u>:  Purchaser shall be responsible for the payment when due of all fees, costs and expenses related to the above Services.

<u>End Date</u>: The date on which Purchaser determines, in its good faith reasonable judgment, that such services set forth in this Item III of the Services Exhibit are no longer required, but in no event shall such end date occur later than two (2) years from the effective date hereof.

**IV.    Employee Healthcare and Benefits**

Description of Services: Seller will maintain its existing healthcare and other employee benefit programs in effect with respect to the certain employees listed in the Employment Agreement Exhibit to the Purchase Agreement and the Seller Principals named therein (collectively, the "*Transferred Employees*").

Fee: Purchaser shall pay to Seller the actual costs incurred by Seller (including the compensation payable to each employee of Seller and related payroll obligations related to such compensation) in connection with the performance of the services set forth in this Item IV of the Services Exhibit.

End Date: The date on which Purchaser determines, in its good faith reasonable judgment, that such services set forth in this Item IV of the Services Exhibit are no longer required, but in no event shall such end date occur later than two (2) years from the effective date hereof.

**V.    Payroll Services**

Description of Services: Seller will provide payroll services for the Transferred Employees in a consistent manner with their past practices.

Fee: Purchaser shall pay to Seller the actual costs incurred by Seller in connection with the performance of the services set forth in this Item V of the Services Exhibit.

End Date: The date on which Purchaser determines, in its good faith reasonable judgment, that such services set forth in this Item V of the Services Exhibit are no longer required, but in no event shall such end date occur later than two (2) years from the effective date hereof.

**VI.    Other Services**

Description of Services: Provide reasonably required assistance with any required audits or inspections relating to the Company Business transferred to Purchaser for pre-Closing periods beginning July 1, 2014.

Fee:  Purchaser shall be responsible for the payment when due of all fees, costs and expenses related to the above Service.

End Date: The date on which Purchaser determines, in its good faith reasonable judgment, that such services set forth in this Item VI of the Services Exhibit are no longer required, but in no event shall such end date occur later than two (2) years from the effective date hereof.